**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KULTHOUM A. MEREISH,
              *Plaintiff-Appellant,*

v.

ROBERT M. WALKER, Acting
Secretary of the Army,
              *Defendant-Appellee.*

No. 02-2366

AYAAD ASSAAD,
              *Plaintiff-Appellant,*

v.

LOUIS CALDERA, Secretary of the
Army,
              *Defendant-Appellee.*

No. 02-2367

RICHARD D. CROSLAND,
              *Plaintiff-Appellant,*

v.

LOUIS CALDERA, Secretary of the
Army,
              *Defendant-Appellee.*

No. 02-2369

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Benson Everett Legg, Chief District Judge.
(CA-98-1696)

Argued: December 3, 2003

Decided: February 20, 2004

Before WILKINSON and NIEMEYER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

---

### COUNSEL

**ARGUED:** Rosemary Agnes McDermott, ATTORNEY AT LAW ROSEMARY A. MCDERMOTT, Thurmont, Maryland, for Appellants. Thomas Frank Corcoran, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

---

### OPINION

WILKINSON, Circuit Judge:

Appellants Kulthoum A. Mereish, Ayaad Assaad, and Richard D. Crosland were scientists employed with the United States Army Medical Research Institute of Infectious Diseases ("USAMRIID"). On May 9, 1997, they were laid off as part of a reduction in force ("RIF"). In separate suits, they alleged, inter alia, that they were terminated on the basis of their age in violation of the Age Discrimination in Employment Act of 1967 (ADEA). *See* 29 U.S.C. § 623(a) (1999). The district court granted summary judgment to the defendant, Robert M. Walker, Acting Secretary of the Army, and we affirm its judgment. The evidence conclusively establishes that the Commander of the USAMRIID, when implementing the RIF, acted upon his skills-based assessment that appellants' positions had become less critical to the agency's mission. Such an exercise of managerial discretion is entirely legitimate under the ADEA.

I.

The district court granted summary judgment to Walker, and we accordingly construe the evidence in the light most favorable to

appellants. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The USAMRIID, a research arm of the U.S. Army, is charged with developing defenses against biological agents that may be used in battle. The USAMRIID employs a variety of scientists who work in different areas, depending upon the precise responsibilities that the agency is assigned. Between 1994 and 1996, the USAMRIID employed 265 people.

Since the early 1990s, the USAMRIID has faced significant budgetary pressures as the Army has downsized. These pressures resulted in numerous personnel cuts, where the Commander of the USAMRIID was ordered to make a certain number of "authorizations," or reductions in personnel, per year. Indeed, between 1990 and 1998, the agency was forced to reduce the number of its civilian positions by over twenty-five percent.

Colonel David R. Franz, then-Commander of the USAMRIID, was responsible for implementing the reductions. Until 1995, Franz had achieved the cuts mostly through a variety of voluntary retirement programs. However, he found these programs to be unsatisfactory for two reasons. First, an insufficient number of employees were willing to retire. More importantly, Franz found that voluntary attrition was allowing scientists critical to the agency's mission to leave. As Franz stated, "you just can't run an organization, a good organization by attrition." By using attrition, Franz was unable to manage the mix of personnel skills necessary to fulfill the agency's goals.

In order to make the required personnel cuts without losing control over the composition of the agency's workforce, Franz decided to utilize RIFs. He instituted three separate RIFs in 1995, 1996, and 1997. Throughout this time period, however, Franz raised objections with his superiors over the level of reductions. For example, in a 1995 memorandum, Franz requested that the required personnel cuts for fiscal year 1997 be reduced from sixteen employees to five. He outlined the USAMRIID's expanding responsibilities, the damage to the agency caused by previous cuts, and the need to protect scientists working in particular areas. Franz wrote a similar memorandum to his superiors in 1996, after receiving word that he would have to make eleven more reductions in personnel in fiscal year 1998. He noted that the USAMRIID had been forced to eliminate a total of seventy-seven

positions during the previous four years, and he again stressed the toll that more cuts would take on the morale and efficiency of the USAM-RIID.

However, after failing to gain relief from the required cuts, Franz elected to utilize RIFs. In the 1995 RIF, Franz was able to meet the authorization levels by eliminating mostly support staff positions. In the 1996 RIF, Franz terminated a statistician, two physiologists, and two laboratory technicians. Finally, in the 1997 RIF, Franz eliminated the only pharmacologist position and the three remaining physiologist positions at the USAMRIID, and he discharged a secretary, an information specialist, and a computer assistant. The elimination of the pharmacologist and physiologist positions resulted in appellants' terminations on May 9, 1997. At the time, Dr. Crosland, a physiologist, was fifty years old; Dr. Assaad, a physiologist, was forty-eight; and Dr. Mereish, a pharmacologist, was forty-three.

Following their discharges, appellants brought separate suits. Dr. Crosland alleged that he was terminated on the basis of his age; Dr. Assaad alleged that he was terminated on the basis of his age, race, and national origin; and Dr. Mereish alleged that she was terminated on the basis of her age and national origin. After the close of discovery, the district court granted summary judgment to Walker on all of the claims.

On October 13, 2000, a panel of this Court upheld the district court's decision as to the claims based on race and national origin. *See Crosland v. Caldera*, No. 00-1325, 2000 WL 1520597, at *1 (4th Cir. Oct. 13, 2000) (per curiam). However, the panel vacated and remanded the case for reconsideration of the age discrimination claims in light of *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). *See Crosland*, 2000 WL 1520597, at **1-2. After further discovery, on September 30, 2002, the district court again granted summary judgment to Walker on the ADEA claims. Appellants now challenge that decision.

## II.

We review a grant of summary judgment de novo. *See Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. Pro. 56(c). If the evidence will reasonably support only one conclusion, summary judgment is proper. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (citation omitted).

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1) (1999). The plaintiff in an ADEA case bears the burden of proving that age was a determining factor in the relevant employment decision. *See Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1314 (4th Cir. 1993). We have recognized two ways in which a plaintiff can establish an ADEA claim: first, through evidence showing that age bias motivated the employment decision under the so-called "mixed-motive" method; and second, through circumstantial evidence of discrimination under the "pretext" method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), and its progeny. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, ___ F.3d ___, No. 01-1359, 2004 WL 25018, at **3-5 (4th Cir. Jan. 5, 2004) (en banc). Appellants attempt here to prove their ADEA claims using both frameworks.

## III.

Appellants have primarily advanced their age discrimination claims under the burden-shifting scheme of proof established in *McDonnell Douglas* and subsequent decisions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (assuming, but not deciding, that the *McDonnell Douglas* framework applies to ADEA claims). Pursuant to this framework, appellants must first establish a prima facie case of discrimination by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). The burden of production then shifts to Walker to articulate a legitimate, nondiscriminatory reason for appellants' termination. *See id.* at 253. If Walker satisfies this burden, the presumption of discrimination created by the prima facie case disappears from the case. *See id.* at 255. Appellants must then prove that Walker's proffered justification is

pretextual. *See id.* at 253. This final burden on appellants "merges with the ultimate burden of persuading the court that [they] ha[ve] been the victim[s] of intentional discrimination." *Id.* at 256. Indeed, at all times, the burden of proving age discrimination rests with appellants. *See id.*

We are willing to assume arguendo that appellants have established a prima facie case of age discrimination, as the district court did below. We therefore consider Walker's proffered reason for the terminations and appellants' evidence of pretext.

### A.

To meet his production burden under the *McDonnell Douglas* framework, Walker is not required to persuade us that the proffered reason was the actual motivation for Franz's decision. *See Burdine*, 450 U.S. at 254. He must merely articulate a justification that is "legally sufficient to justify a judgment" in his favor. *See id.* at 255.

Simply put, Walker claims that Colonel Franz based his decision to terminate appellants on the needs of the USAMRIID. Franz asserted that, in determining which positions to eliminate in the 1997 RIF, he focused on "mission relevance." According to Franz's testimony, the USAMRIID's mission was expanding rapidly. The agency was already charged with developing vaccines, drugs, and diagnostics related to a growing set of biological agents. In addition, as biological warfare became a greater concern, the USAMRIID was charged with training soldiers on how to respond in the field and with preparing contingencies in the event of an attack on our nation or our embassies abroad. To meet these multiple demands, Franz decided to retain a strong technical base at the agency, particularly in areas like microbiology where he determined the need was greatest. In his view, retaining scientists with the kind of technical expertise possessed by microbiologists — such as gene splicing — was critical to the agency's ability to fulfill its historic mission and meet its new responsibilities.

By contrast, in Franz's view the pharmacologist and physiologist positions were less central to the most pressing demands on the agency. At the time of the RIF, Dr. Mereish, a pharmacologist, was

not conducting research at the USAMRIID but rather was on detail to the Biological Arms Control Treaty Organization. Dr. Assaad, a physiologist, was working on developing a vaccine for ricin utilizing a particular kind of antigen. His research, however, was superseded soon after he was discharged in favor of new ricin research based on a recombinant molecular construct, which is an entirely different source than the antigen upon which Dr. Assaad was focusing. Finally, Dr. Crosland, a physiologist, was investigating botulinum toxins at the time he was laid off. He was attempting to develop a cell line that would respond to botulinum toxins, in order to facilitate further research of these agents. After he was laid off, his research was not continued. According to Franz, these positions were ones that were not experiencing much progress, or that were not considered to be as relevant as other specialties to the agency's expanding mission. As Franz put it, they were not areas "in which we're going to make a big difference for the soldier."

In terminating appellants, Franz asserted he aimed to ensure that the technical skills possessed by the USAMRIID employees after the RIF would match the changing nature of the threats to which the agency was designed to respond — namely, biological war and terrorism. Such a strategic business decision constitutes a legally sufficient justification for appellants' termination. *See, e.g.*, *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 571, 572, 574-75 (7th Cir. 2003) (recognizing as a legitimate reason for a discharge "an effort to address adverse financial conditions," where management "determined that retaining [one employee] was more integral to the success of the venture" than retaining the plaintiff); *EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1176, 1183 (5th Cir. 1996) (recognizing as a legitimate reason for conducting layoffs a firm's need to retain employees with "the contemporary skills necessary to assimilate new technologies").

If we failed to allow proffered justifications such as Walker's, we would undermine the capacity of public and private entities to adapt to their environment. Without the ability to update the skills of their employees to meet the shifting demands of technology and society, businesses could not thrive and agencies would be powerless to carry out important public functions. As we have noted, "the ADEA was not intended to obstruct the ability of a commercial enterprise to make

necessary adjustments in the face of economic challenges." *See Birk-beck v. Marvel Lighting Corp.*, 30 F.3d 507, 513 (4th Cir. 1994). Neither was it designed to prevent leaders in the public sector from achieving the mix of employee expertise that will best fulfill an agency's goals.

## B.

Walker has thus proffered a legitimate, non-discriminatory reason for the termination decision. Appellants can meet their burden of proving pretext either by showing that Walker's explanation is "unworthy of credence" or by offering other forms of circumstantial evidence sufficiently probative of age discrimination. *Burdine*, 450 U.S. at 256; *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). As we have noted, appellants ultimately must prove that they were the victims of age discrimination. *Burdine*, 450 U.S. at 256.

Appellants contend that Franz, and indeed the entire command at the USAMRIID, harbored a discriminatory attitude towards older employees. This bias, appellants argue, led to their discharge. To support this claim, appellants point to several pieces of evidence. First, they point to a memorandum written by Colonel Franz to his superior in May 1995, asking for a reduction in the number of cuts for the USAMRIID. Franz stated:

> My goal is to accomplish the reductions with minimal impact on mission. This will be difficult, given the large decrement, and will result in my actions impacting negatively on our staff of key scientific professionals. . . . It is the young, bright, junior scientists (the core of our molecular biological vaccine development effort) that I must attempt to protect. Unlike health care providers, many of these specialists are one or two deep in the free world. They are irreplaceable.

Appellants contend in particular that Franz's statement that he must protect "the young, bright, junior scientists" evinces a discriminatory animus against older employees.

Appellants also point to statements attributed to Colonel Glenn, the Director of the Medical Systems Integration Office Headquarters, which, like the USAMRIID, is a part of the United States Army Medical Research and Material Command ("USAMRMC"). As appellants note, Glenn expressed concern about the aging workforce at the USAMRIID, and the "tunnel vision" and lack of flexibility characteristic of some scientists. Similarly, in a memorandum to the Commander of the USAMRMC, in which Glenn gave his Review & Analysis of the USAMRMC, Glenn noted the "problem" of the "average age going higher." He stated that "only USAMRIID cut below the authorization limit to hire back either younger or different technology skills." In appellants' view, these statements by Glenn, like those made by Franz, reveal a discriminatory animus against older employees and establish pretext.

We disagree. First, we have consistently held, along with other circuits, that general or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination. *See, e.g.*, *Birkbeck*, 30 F.3d at 511-12 (holding that the statement that "there comes a time when we have to make way for younger people" is insufficient to create any "inference of age bias" because it is a stray remark which merely reflects a fact of life); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942-43 (4th Cir. 1992) (holding that references to the need to "attract newer, younger people" or "young blood" were insufficient evidence of age bias because they were isolated and merely reflected a truism of business life); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (holding that the reference to needing "some new young blood" was insufficiently probative of age bias); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (holding that the reference to needing "younger blood" was insufficiently probative of age bias).

Also, when evaluating alleged age animus, we must consider the context in which statements were made. Here, as we detailed above, the USAMRIID's mission was expanding. It was continuing its historic mission of developing vaccines, drugs, and diagnostics related to increasing numbers of biological agents. And the agency had recently been charged with protecting soldiers against biological agents on the battlefield and with protecting the civilian population generally against the rising threat of terrorism at home. Scientists with

the skills possessed by microbiologists and other specialties were in Franz's view highly relevant to this effort, and the agency wanted to go to some lengths to attract and retain them. The employment strategies of Franz and Glenn were inevitably informed by these realities.

Read in this context, Franz's and Glenn's comments reinforce, rather than undermine, Walker's proffered reason for appellants' termination. Their statements were referring to the need for scientists with more relevant and current skill sets, rather than to scientists' chronological age. Franz's comments in his May 1995 memorandum, for example, clearly evidence his desire to retain those scientists who were most difficult to find and who possessed the most recent training and skills. Indeed, Franz stated quite explicitly in the memo itself that, by "young, bright, junior scientists," he meant "the core of our molecular biological vaccine development effort." And he later reiterated that his reference to "young" scientists was made purely in terms of "technical capabilities" and the recency of their education and training, regardless of age. It is clear from reading Franz's statements in context that he was expressing the need to retain those scientists with cutting-edge skills in critical areas.

Likewise, Glenn's comments reflect the same need to retain those scientists with the most up-to-date skills and training. To begin with, Glenn, who was the leader of a separate unit from the USAMRIID, was not even a decision-maker with regard to the RIF. Moreover, he made clear that his remarks on the "aging" of the workforce were directed at "the aging technologically of the skills of the work force." Part of his concern also was that, due to the inability of agencies within the USAMRMC to hire new scientists in recent years because of downsizing, a significant portion of the agencies' scientists might retire at the same time and thus result in a sudden loss of a "critical mass of expertise and knowledge in certain areas." His comment on the USAMRIID's success in hiring back "younger or different technology skills" likewise alluded to maintaining the agency's scientific capacity to meet the latest forms of biological threats. And Glenn's reference to the lack of flexibility of scientists was not age-related, as he was discussing the importance of adjusting ways of thinking to dangers subject to nothing so much as rapid change.

It is significant, moreover, that the 1997 RIF was conducted on a position-wide basis. When implementing the RIF, Franz targeted cate-

gories of scientists, not individual employees. In his judgment, the pharmacologists and physiologists were less relevant to the agency's mission. He cut those positions and retained all of the scientists in the other research fields. It is undisputed that all pharmacologists and physiologists were removed, no matter what their age. Appellants are unable to point us to any set of scientific skills within the agency which Franz mined selectively for age. Appellants simply cannot claim in the face of such a neutral RIF method that Franz terminated them individually based on age. *See Birkbeck*, 30 F.3d at 512 (noting the significance of the fact that an entire department was eliminated, rather than individuals, and stating that "it would make little sense for [the employer] to shut down an entire twelve person department . . . simply to rid itself of that department's 62 year old supervisor").

Appellants have also provided us with no evidence that Franz selected the pharmacologist and physiologist positions in order to rid the agency of its oldest employees. Every other field, whether it be chemist, research chemist, microbiologist, or entomologist, was significantly staffed by individuals older than all or some of appellants. Yet every person in these other positions was retained, regardless of age. In fact, the statistics show that appellants were not nearly the oldest employees at the USAMRIID. The average age of the agency's workforce was almost forty-six years, whereas appellants were ages forty-three, forty-eight, and fifty. And there were twenty-one scientists who were older than Dr. Crosland, none of whom were affected by the RIF. All of this evidence belies the notion that Franz simply selected those positions which were staffed by the oldest employees.

Appellants argue, however, that Franz was not even required to conduct a RIF, but instead capitalized upon it in order to act upon his bias against older employees. The evidence fails to support this contention. As detailed above, Franz had no choice but to reduce the level of staffing at the USAMRIID. He elected to conduct RIFs only after finding that other methods of meeting the authorizations — namely, voluntary attrition — proved detrimental to the agency. And Franz strenuously objected to his superiors about the impact that the cuts were having on morale at the USAMRIID. Other than appellants' speculation, there is simply nothing to indicate that Franz took gratuitous advantage of a RIF in order to terminate older employees.

Finally, appellants assert that, contrary to Franz's claims, their positions were important to the USAMRIID's missions. For example, they contend that physiology is listed among the various responsibilities of the agency. And, appellants claim, they were conducting breakthrough research that was critical to the nation's security. As detailed above, at the time of the RIF, Dr. Mereish was on detail with a biological arms production organization; Dr. Assaad was attempting to develop a vaccine for ricin; and Dr. Crosland was researching botulinum toxin in order to advance the scientific testing of that agent. Accordingly, appellants argue, Franz's asserted justification for their terminations cannot be true.

Appellants' contentions misconstrue the basis of Franz's termination decision. Franz never stated that appellants' skills and research were unimportant or irrelevant to the USAMRIID's mission. The very nature of a RIF is that some workers must be let go, and difficult decisions have to be made. Franz's judgment was therefore a comparative one: he determined that the pharmacologist and physiologist positions were *less* integral than others to the agency's mission. Tellingly, appellants have not responded to this comparative judgment by pointing to any evidence that their positions were *more* relevant to the agency's mission than, for example, microbiologists or research chemists.

Moreover, in pressing us to assess the importance of their research to national security, appellants misconceive the role of the federal courts in resolving claims such as the present one. It is not our place to second-guess the soundness of scientific or managerial decisions under the guise of the ADEA. Our role is much more circumscribed; we are concerned only with ensuring that decision-makers are not improperly motivated by discriminatory animus. *See Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 722-23 (4th Cir. 2002). Appellants may disagree with Franz's conclusion as to which positions to eliminate, but the ultimate responsibility for that judgment lies with Franz. Our focus is solely on whether this decision was the result of age bias.

On that score, we find appellants' evidence of pretext wholly insufficient to raise a genuine issue of material fact. Franz's decision to terminate appellants was skills-based rather than age-based; it was

applied neutrally to positions rather than to individuals; and it was amply supported by evidence indicating the shifting demands facing the USAMRIID. Appellants have failed to bring the legitimate justification of the agency into genuine dispute.[1]

IV.

Appellants also argue on appeal that they should prevail under the mixed-motive method of proving age discrimination. Under the mixed-motive framework established by the Supreme Court in *Price Waterhouse v. Hopkins*, appellants must prove through direct evidence that age was a substantial motivating factor in the termination decision. *See* 490 U.S. 228, 258 (1989) (plurality opinion); *id.* at 259 (White, J., concurring); *id.* at 276 (O'Connor, J., concurring). If appellants satisfy this burden, then Walker must prove that Franz would have taken the same action even absent consideration of age in order to avoid liability. *Price Waterhouse*, 490 U.S. at 258 (plurality opinion); *id.* at 259-60 (White, J., concurring); *id.* at 276-77 (O'Connor, J., concurring).

The *Price Waterhouse* framework of proving discrimination, created in the Title VII context and adopted in the ADEA context, has been altered by Congress for Title VII claims. In the Civil Rights Act of 1991, Congress made the mixed-motive framework more favorable to Title VII plaintiffs in two ways. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, ___ F.3d ___, No. 01-1359, 2004 WL 25018, at **3-5 (4th Cir. Jan. 5, 2004) (en banc). First, Congress provided that plaintiffs can invoke the codified mixed-motive framework by putting forth any type of evidence — direct or circumstantial — which demonstrates that discriminatory animus was a motivating factor for an employment practice. *See* 42 U.S.C. § 2000e-2(m) (2003); *Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148, 2153-55 (2003). Second, Congress disallowed employers from escaping liability by proving that they would have made the same decision even without any discrimi-

---

[1]Because we find that appellants have not provided sufficient evidence of pretext, we do not need to consider whether the rule announced in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-49 (2000), applies in this case. *See Rowe v. Marley Co.*, 233 F.3d 825, 829-30, 831 (4th Cir. 2000).

nation. Rather, such proof only permits employers to limit the remedies available to plaintiffs. *See* 42 U.S.C. § 2000e-5(g)(2)(B).

We have not had occasion to decide whether the mixed-motive provision under the Civil Rights Act of 1991 applies to the ADEA. We have previously expressed doubt that it does, and instead we have suggested that the *Price Waterhouse* framework still applies to ADEA claims. *See, e.g.*, *Hill*, 2004 WL 25018, at *4 n.2. This is in large part because, when Congress enacted the Civil Rights Act of 1991 in response to *Price Waterhouse*, it amended only Title VII and did not pass a corresponding amendment to the ADEA. And maintaining the higher evidentiary burden in *Price Waterhouse* for ADEA claims is not implausible, given that age is often correlated with perfectly legitimate, non-discriminatory employment decisions.

Ultimately, however, whether we apply the more lenient standard found in 42 U.S.C. § 2000e-2(m) or *Price Waterhouse*, the mixed-motive framework is of no avail to appellants here. As we have detailed, the record demonstrates that Franz's decision was motivated solely by his goal of ensuring that the USAMRIID was staffed with the appropriate mix of skills and talents necessary to defend against the changing threats of biological war. There is simply no evidence — direct or circumstantial — upon which a jury could reasonably conclude that age was a motivating factor in Franz's decision to terminate appellants.

## V.

Appellants have thus failed to meet their evidentiary burden of demonstrating that they were terminated because of their age. In these circumstances, summary judgment is appropriate.[2] The judgment of the district court is therefore

*AFFIRMED*

---

[2]Appellant Crosland appealed to the district court from an adverse decision by the Merit Systems Protection Board ("MSPB"), which had rejected all of Dr. Crosland's challenges to the legitimacy of the RIF. *See* Supp. App. 5-10. The district court rejected Dr. Crosland's claims on appeal, and we find no error in that judgment.