*150 GREGORY, Circuit Judge,
dissenting:
Ellice Luh, a former employee of J.M. Huber Corporation (“Huber”), appeals from the United States District Court for the District of Maryland’s grant of summary judgment in favor of Huber. Luh, who is an Asian-American female, alleges that Huber denied her a promotion and terminated her employment on the basis of her race and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (2000), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (2000). Because Luh has produced sufficient evidence to demonstrate that Huber’s proffered reasons for not promoting her to the new manager position and terminating her employment were false or, at best, dubious, she has established a triable issue regarding pretext for discrimination. Therefore, I respectfully dissent.
I
The following is a recitation of the facts construed, as they must be, in the light most favorable to Luh, the nonmovant for summary judgment. Luh earned a Ph.D. in engineering from the University of California at Berkley in 1988. For the next nine years, Luh worked for W.R. Grace Company, in the areas of research and product development. During her tenure at W.R. Grace, Luh helped to develop, inter alia, aluminum nitrate for semiconductors, silicon carbide whiskers, non-moire electromagnetic shielded glass, ceramic composite materials, and dental silica applications.
In 1997, Luh left W.R. Grace to accept a position as the Technology Manager for Huber’s Dental Group, part of which later became Huber’s Engineered Materials Division (“HÉM”). Huber, which is headquartered in Atlanta, Georgia, is a diversified, multinational supplier of engineered materials, natural resources, and technology-based services. Luh worked in the area of dental silicas at Huber’s Havre de Grace, Maryland facility from September 21, 1997, until her termination on June 30, 2000. During her three-year tenure with Huber, Luh had several different supervisors, including Robert Klem, Jorma Sakko, and Mike Withiam.
Between 1997 and 2000, Luh received three generally positive annual performance reviews from her supervisors. On her 1997 annual performance review, Klem concluded as follows:
Ellice has rapidly brought herself up to speed with her role as Dental Technology Manager. She has gained the respect of her peers in our Division. I expect Ellice will accelerate and progress in Dental Technology in 1998. Ellice clearly has the potential to be a future leader in Huber.
J.A. 147. Similarly, at the end of 1998, Klem concluded that Luh had “rapidly matured as a leader for our Dental Technology team.” J.A. 155. Further, Klem praised Luh for her “high degree of dedication and professionalism” and concluded that these attributes would carry Luh “forward for Huber.” Id. Also in 1998, Huber’s President of Engineered Materials, David Hill, selected Luh to participate in the company’s Long Term Incentive Pay Plan. See J.A. 194. In so doing, Hill praised Luh for her contributions and stated that the viability of the HEM division depended on “the talents and expertise of people like you.” Id.
In Luh’s 1999 evaluation, Withiam, who had replaced Klem as Luh’s direct supervisor, noted that “[djespite the commercial and technical success, significant concerns remain in the area of relationships and leadership. Time spent on relationship conflicts impacted morale and cohesiveness of the [Personal Care team].” J.A. 162. Nevertheless, Withiam concluded that Luh was “bright, an excellent communicator, *151 [was] well liked and [added] greatly to the overall depth of our effort in Personal Care.” Further, Withiam stated that he looked forward to Luh “taking an active role, beyond oral care, in the Consumer Products team.” J.A. 162.
During her tenure as the Technology Manager for Huber’s Dental Group, Luh oversaw the development of what became known as the “Janis Project,” which was an effort to develop a new dental silica product that would clean teeth without being too abrasive. Luh contends that one of the staunchest supporters of the Janis Project was Michael Martin, then Huber’s Global Business Leader for Oral Care. In that capacity, Martin testified that he had the authority to recommend either the approval or termination of technological oral care research projects to his direct supervisor, Ron Cole, Huber’s Global Consumer Leader. See J.A. 982-84. According to Luh, Martin suddenly withdrew his support for the Janis Project immediately after she rebuffed his sexual advances at an American Association for Dental Research Convention in Washington, D.C., on April 5, 2000.
During the convention, Luh, Martin, and Rick Cates, Huber’s silica products account manager, hosted a private dinner party at the Georgetown Club for employees of Colgate, an important Huber customer. Luh testified that, after the dinner, she, Martin, and Cates returned to the lobby bar of Martin’s hotel to discuss the convention and business generally. J.A. 427-28. After Cates left the table to pay the bill and use the restroom, Martin remarked to her that it was wonderful for employees to have the opportunity to get to know each other on a more social level. J.A. 430. Luh testified that" Martin then mentioned that he would be “very discreet,” as he had been in relationships with other women. Id. According to Luh, Martin stated that neither his nor Luh’s marriage should “interfere with an opportunity to get to know each other better.” Id. Luh contends that she rebuffed Martin’s advances by telling him that he had had too much wine and she would see him at work the next week. J.A. 431. Luh testified that she told Cates about Martin’s overture the following week. Cates testified that Luh had told him about Martin’s advances “within the next few days during a meeting.” J.A. 1168. Further, Cates testified that Martin had been “drinking a lot that night” and that someone at the dinner had remarked that “Michael is pretty bombed.” J.A. 1169, 1165. Martin denied drinking alcohol the night of the Colgate dinner. See J.A. 991. Further, Martin denied making a sexual overture towards Luh. See J.A. 992.
Despite his initial support for the Janis Project, Martin undertook a concerted effort to postpone the filing of the Janis patent application, beginning two days after the convention in Washington, D.C. On April 7, 2000, Martin sent a three-page memorandum to a select group of HEM supervisors, including Cates and Ron Cole, but conspicuously excluding Luh. In this memorandum, Martin asserted as follows:
I might have been a little slow in getting up to speed on all aspects of Janis, a very complex project [sic] but our meetings in Washington DC [sic] with Colgate, from a business standpoint, lead me to strongly ask for postponing the filing of the Janis patent application in its current form.
J.A. 175. Over the course of the next week, Martin wrote multiple e-mails and letters to HEM supervisors, in which he described the Janis project as a “hoax” and blamed these shortcomings on Luh because she spent too much time on customer relations, instead of managing technology. J.A. 1033, 1175. Cates testified that the timing of Martin’s aspersions was *152 “odd,” given that just a week before, at the dental convention in Washington, D.C., “he was all for it.” J.A. 1174. Cates further testified as follows:
As a matter of fact, he [Martin] was responsible for half the presentation [about Janis] with Colgate the next day ... and was very positive about the whole thing, and then he really didn’t get involved with it anymore.
J.A. 1174-75.
On April 15, 2000, in the midst of Martin’s campaign against Luh and the Janis Project, Thomas Izod (“Izod”) joined Huber as Director of Technology and became Luh’s immediate supervisor. As Director of Consumer and Industrial Technology, Izod had supervisory authority over Luh’s Dental Technology Group and the Food, Feed Health, and Care Group (“FFH & C”). In this role, Izod asserted that he was responsible for reducing the research and development costs of both the Dental Technology Group and FFH & C. Accordingly, Izod created a consolidation plan, whereby he combined the Dental Technology Group and the FFH & C group into a single entity, the new Consumer Technology Group.
Izod testified that one of his goals in consolidating the two groups was to deemphasize the dental products and “move more aggressively into the personal care cosmetics area.” J.A. 646. Within two weeks of his hiring, Izod decided to retain either the manager of the Dental Technology Group (Luh) or the manager of the FFH & C, Philip Block, but not both of them. See J.A. 637.
Like Luh, Block had impressive educational credentials, having obtained a science Ph.D. from the University of North Carolina in 1993. Thereafter, Block worked for Johnson & Johnson and Unilever in the areas of sterilants, surgical gloves, and skin care. As Block had only joined Huber as manager of FFH & C in November 1999, he had not been employed long enough to have had a performance review. Over the course of two months, Izod undertook an evaluation of these two managers. According to Izod, his evaluation process consisted of a single one-hour interview with each manager and discussions with various Huber supervisors about each manager’s experience, past performance, and capabilities. Those discussions included at least one talk with Martin sometime between April and June 2000. Izod was aware of Martin’s efforts to communicate to other supervisors his concerns about the Janis Project. Izod admitted that Martin talked to him about Luh and those concerns. See J.A. 630, 653, 655-56.
At the same time Izod was evaluating Luh and Block, he began to evaluate the rest of the employees under his supervision. Subsequently, Izod came up with a reduction-in-force plan for the new Consumer Technology Group. Izod memorialized his reduction-in-force plan on a single sheet of paper. Specifically, Izod listed each of the forty-six employees from the Dental Technology Group and FFH & C in one of three columns on a single sheet of paper. Izod titled the first column, which listed thirty-four employees, “KEEP OR MOVE,” the second, which listed seven employees, “POTENTIAL LEAVE,” and the third, which listed five employees, “DEFINITE LEAVE.” Izod placed Luh in the potential leave category. From this initial list, Izod and his supervisor Rob Edmonds eventually selected a total of six employees for termination.
Before Huber implemented Izod’s reduction-in-force plan in June 2000, the workforce population managed by Izod consisted of forty-six employees, of whom thirty-nine were Caucasian, two were African American, and five were Asian American. Thus, Caucasians constituted 85% of the existing workforce, while Asian and *153 African Americans constituted 11% and 4%, respectively. Of the six employees selected by Izod and Edmonds for termination, three were Asian American and three were Caucasian. Thus, 50% of the employees selected for termination under the reduction-in-force plan were Asian American, thereby reducing by 60% Izod’s Asian American workforce.
On June 27, 2000, Huber informed Luh that she had been selected for termination due to restructuring. At or about the same time, Izod selected Block to be Technology Manager for the Consumer Technology Group. After declining Huber’s offer of a severance package and outplacement services, Luh filed a timely charge of discrimination with the Baltimore District Office of the United States Equal Employment Opportunity Commission (“EEOC”). After the EEOC issued a determination of reasonable cause that Luh was discharged from Huber on account of her race and gender and because of quid-pro-quo sexual harassment, Luh filed a timely suit in the District of Maryland. In her complaint, Luh alleges that Huber discriminated against her on account of her race and gender, while favoring a less qualified Caucasian male employee, Philip Block. Further Luh alleges that Huber’s decision not to select her was influenced by false accusations of poor performance, made by a manager whose sexual overtures she had rebuffed.
After discovery, Huber filed a motion for summary judgment on all three counts. The district court granted the motion without hearing oral argument. In so doing, the district court assumed for the purposes of summary judgment that Luh had established a prima facie case of racial and gender discrimination. However, the court held that these claims failed because Luh had not put forth sufficient evidence to suggest that the reasons cited by Huber were pretext for discrimination. J.A. 1259. The district court also granted summary judgment on the quid-pro-quo claim, concluding that even if Michael Martin had in some way influenced Izod’s decision, Huber could not be held hable for this impermissible influence. J.A. 1260. This appeal followed.
II
Although Luh raises a number of sub-issues relating to the district court’s application of Title VII’s burden-shifting framework, the central issue to be decided is whether the district court correctly granted summary judgment for the defendant on Luh’s claims of race and gender discrimination under Title VII and § 1981.
This court reviews de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). Ultimately, summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Title VII makes it “an unlawful employment practice for an employer ... to discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race ... [or] sex.” 42 U.S.C. § 2000e-2 (a)(1). A plaintiff may establish a Title VII claim by either of two methods of proof: (1) using a “mixed-motive” framework, whereby the plaintiff demonstrates, by way of direct or circumstantial evidence, that race or sex discrimination motivated the employer’s adverse employ *154 ment decision; or (2) using the familiar burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), whereby the plaintiff demonstrates, by way of circumstantial evidence, that the employer’s proffered reason for the adverse employment action is merely a pretext for racial or gender discrimination. The district court relied primarily on the burden-shifting framework to analyze the summary judgment motion and Luh relies exclusively on this framework to argue that summary judgment was inappropriate.[1]
Under the McDonnell Douglas burden-shifting framework, a plaintiff must first establish a prima facie case of race or gender discrimination.[2] See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir.2004) (en banc). Assuming the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to proffer a permissible, nondiscriminatory basis for taking the adverse employment action. See id. In a reduction-in-force context, a plaintiff must show that (1) she is a member of a protected class; (2) she was selected for discharge from a larger group of candidates; (3) she was performing at “a level equivalent to the lowest level of those of the group retained”; and (4) “the process of selection produced a residual work force of persons in the groups containing some unprotected persons who were performing at a level lower than that at which she was performing.”[3] O’Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 546 (4th Cir.1995), rev’d on other grounds, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).
If the defendant proffers a permissible, non-discriminatory basis for its action, then the initial presumption of discrimination is rebutted and the burden of production shifts back to the plaintiff to prove that the defendant’s proffered reason is mere pretext for discrimination. See id. A plaintiff can accomplish this by showing *155 that the employer’s proffered reason is false because “in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
The district court assumed that Luh has established a prima facie case of racial and gender discrimination.[4] Therefore, I now turn to the more difficult questions of whether Huber proffered legitimate, nondiscriminatory reasons for her termination, and, if so, whether Luh has demonstrated that these proffered reasons were pretext for discrimination. Ultimately, for the reasons discussed below, I conclude that Huber’s proffered justification is legally insufficient to justify the grant of summary judgment in its favor on the race and gender discrimination claims.
As this court recently recognized in Mereish v. Walker, 359 F.3d 330 (4th Cir. 2004), an employer seeking to rebut a prima facie showing of discrimination is not required to persuade the court that “the proffered reason was the actual motivation for ... [the] decision.” Id. at 335. Instead, the employer “must merely articulate a justification that is legally sufficient to justify a judgment in his favor.” Id. (internal quotation marks and citations omitted). Although an “employer has discretion to choose among equally qualified candidates, provided the decision is not based on upon unlawful criteria ...,” Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 259, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the overwhelming evidence in this case demonstrates that Luh was far more qualified than Block with respect to the skills Izod professed to be pertinent to his decision.
Consistent with his intention to retain only one manager, Izod testified that he undertook a comparative evaluation of Luh’s and Block’s credentials. See J.A. 643-652. Izod testified that he conducted a single, one-hour interview with each candidate and solicited feedback about each manager from various Huber supervisors. See J.A. 640-655. Huber asserts that Izod ultimately decided to retain Block over Luh because he concluded that Block stood out in the following areas: (1) customer interaction, (2) planning, (3) leadership, (4) presentation skills, (5) team orientation, (6) new idea concepts, and (7) field expertise. J.A. 640. The record evidence strongly indicates, however, that Izod failed to consider and credit a plethora of relevant evidence pertaining to Luh’s strengths in these areas. Accordingly, I find that a jury could reasonably conclude that Luh was more qualified than Block and, thus, infer that Izod’s decision to select Block over Luh was indicative of pretext.
With respect to the planning and new idea concepts criteria, Huber asserts that Izod concluded that Block was more qualified than Luh. Izod testified that during his one-hour interview with Luh, “she came across as not being an individual that was terribly interested in other things outside the dental area.” J.A. 644. By contrast, Izod testified that he found Block to be interested in the development of new consumer products, particularly in the *156 area of cosmetics. See J.A. 802. Izod testified that he was particularly impressed with Block’s ideas for fragrance carrying, cosmetic samples that Block had recently presented at a cosmetic show, and Block’s desire to develop the skin care area. J.A. 909. Izod’s overall impression of Block was that, contrary to Luh, he was someone who was “going to step up and do something that’s going to create the change that’s of value to the company.” J.A. 645.
Although Huber contends that Izod concluded that Block was more qualified than Luh in terms of the planning and formulating consumer products, Izod conceded at his deposition that he had never actually asked Luh about her ideas for expanding research and development in this area. See J.A. 644. Further, Izod admitted that he had faded to ask Luh whether she had attended any cosmetic shows, or whether she had any familiarity with the cosmetics industry. J.A. 688-69. Indeed, had Izod taken the time to review Luh’s previous employment evaluations, he would have discovered that Luh had attended a global cosmetics convention in London in 1998 and that Luh’s team’s “[d]ye-absorbing silica granules [had] received positive feedback from 5 different companies in Europe.” J.A. 877. Furthermore, Izod’s purported conclusion that Block was more innovative than Luh is dubious in light of the fact that Block had only had eight months experience as a product manager at Johnson and Johnson, where he helped to develop latex gloves, and had only worked for Huber for a period of six months when Izod began his evaluation. To the contrary, Luh had worked for Huber for a period of three years and was instrumental in the research and development of numerous dental and consumer products, including cosmetics. In short, Block did not adequately consider Luh’s knowledge, interest, and experience in consumer products and overstated Block’s qualifications in this area.
Turning to the proffered customer relationships and presentation skills criteria, the evidence indicates that Izod disregarded Luh’s considerable strengths in these areas. Unlike the relatively new Block, Luh had cultivated relationships with many of the company’s major-dental and consumer products customers over the course of her three-year tenure with the company. Luh’s 1998 performance evaluation concludes that Luh had “demonstrated good customer focus during the past year through her address of the various long-term programs and short-term technical service needs of our customers.” J.A. 152. Importantly, even Michael Martin praised Luh’s “acumen” in the area of customer relations. See J.A. 997. Izod even conceded that he had been informed “by a number of people” that Luh’s customer presentation skills were “very good.” J.A. 640. Because of his relatively short tenure with the company, there is no comparable evidence in the record regarding Block’s performance in these areas. However, Izod testified that he had been told that Block had performed well at a European cosmetics convention. See id.
As for leadership and team orientation skills, it is apparent that Izod disregarded a wealth of evidence of Luh’s strengths in these areas. Huber asserts that Izod concluded that Luh would not be an effective leader, mainly because Luh told Izod during her interview that she was “having difficulty” with “some of the current management,” specifically Michael Martin. J.A. 417-418. During the interview, Luh told Izod about Martin’s negative e-mail campaign against her and the Jams Project. J.A. 418.[5] Further, Luh confided in *157 Izod that if these problems persisted, she could not see herself at Huber for another five years. J.A. 420. Izod testified that he concluded from this conversation that Luh was “so wound up” in a number of areas concerning her history, that she did not seem “terribly interested in other things outside of the dental area.” J.A. 644. Accordingly, Izod concluded that Luh would not be an effective leader of his new Consumer Technology team. See id.
In reaching his conclusion, Izod admitted that, although he had read Luh’s most recent annual evaluation, he had not reviewed her other evaluations, which had noted Luh’s initiative and leadership ability. J.A. 668-69. Further, Izod admitted that he had not been aware that Huber had selected Luh for its leadership development program in 1998 or that she had been selected for a long-term retention contract. J.A. 668. Izod even admitted that he hadn’t known that Luh “had been successful at Huber.” J.A. 675. Izod defended these omissions by stating as follows:
I’m trying to evaluate people. As I said earlier on, Mr. Clifford, I was trying to find out who I wanted on my team. Okay? I was trying to get from these one-on-ones, these introductory type one-on-ones I wanted to get a feel for the type of person we had. I wasn’t really interested in going back and looking at a lot of history quite frankly because history is just — I’m looking to make something start again, get off to a fresh start in an organization....
J.A. 675.
I also note that Izod disregarded the concerns of a number of Huber employees with respect to Block’s leadership and team orientation skills. During his deposition, Izod conceded that even before he selected Block, he was aware that some employees of the FFH & C team were unsatisfied with Block’s heavy-handed leadership style. See J.A. 649-51. Similarly, Richard Cates testified that a number of FFH & C had voiced concerns about Block. See J.A. 1139 — 41. Izod downplayed these concerns as expected disgruntlement by employees who were resentful of their new manager for making them work harder. See id. I note, however, that Block resigned his position as Consumer Technology Manager within six months and left the company altogether within a year of Izod’s hiring. Although Izod claims that Block left voluntarily, there is significant evidence that suggests otherwise. At her deposition, Luh testified that Block later told her that Izod had asked him to resign. This scenario is more consistent with Block’s January 5, 2001, performance evaluation, in which Izod concluded as follows:
My main concern is the initial negative response to Phil by a number of people outside the group in other departments. There must be a problem here because the issue crosses several departments, yet I can’t identify an exact cause. The inputs that I’ve received are that Phil was too aggressive and controlling when he first started as Consumer Technology Manager. Conversations with people concerned suggest that Phil’s approach has improved in the past month. The consensus is that PM is really bright, but that his management inexperience is the basis for the problem.
J.A. 216 (emphasis added). Based on this evidence, a jury could reasonably conclude that Luh was more qualified than Block in terms of leadership and team orientation sMls.
In sum, I conclude that Izod’s bases for not selecting Luh for the manager position are unworthy of belief (or at least very *158 suspicious) because Luh was better qualified than Block under Izod’s stated criteria. The record is replete with evidence from which a jury could conclude, as did the EEOC, that Izod was lying when he testified that he selected Block to be Consumer Technology Manager because of Block’s superiority in (1) customer interaction, (2) planning, (3) leadership, (4) presentation skills, (5) team orientation, (6) new idea concepts, and (7) field expertise. The evidence of pretext that Luh presented is sufficient to survive a motion for summary judgment.
Ill
For the foregoing reasons, I respectfully submit that this Court should reverse the district court’s grant of summary judgment with respect to the race and gender discrimination claims. Thus, I dissent.

. In the concluding paragraphs of its memorandum opinion, the district court briefly asserted that Luh’s claims also failed under a mixed-motive framework because the circumstantial evidence presented did not establish that race or gender was a motivating factor in her termination. See J.A. 1260. Luh does not take issue with this alternative holding, relying solely on a burden-shifting framework to attack the propriety of the district court’s grant of summary judgment.

. The McDonnell Douglas framework is used in both Title VII and § 1981 cases. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 189 (4th Cir.2001).

. Luh argues that the reduction-in-force standard is inapplicable because Huber was choosing between only two people for the manager position instead of choosing from a larger group of people. In so doing, Luh relies on this court's decision in Karpel v. Inova Health Sys. Servs. Inc., 134 F.3d 1222, 1228 (4th Cir.1998). In that case, the plaintiff alleged that she had been subject to race discrimination after being terminated from her employment for unsatisfactory performance. In the context of that case, we recognized that in order to establish a prima facie case of discrimination, the plaintiff would have to demonstrate (1) that she was a member of a protected class; (2) that she was qualified for her job and her performance was satisfactory; (3) that, in spite of her qualifications and performance, she was fired; and (4) the job remained open to similarly situated employees after her termination. Id. Thus, to the extent that the plaintiff in Karpel was not laid off as part of an overall restructuring or reduction in force, but for allegedly unsatisfactory job performance, the prima facie standard set forth in that case is inapplicable here. As Huber correctly notes in its brief, the standard for establishing a prima facie case in the reduction-in-force context does not change depending on the number of employees subject to termination by the employer. So long as the employee was terminated as a result of her employer’s reduction-in-force plan, we will apply the prima facie standard articulated in O’Connor.

. Huber suggests that had the district court analyzed the evidence to determine whether Luh had established a prima facie case of discrimination it likely would have concluded that she did not because there was little to no evidence to satisfy the fourth prong. The record evidence belies this argument. Considering Luh’s stellar educational background, extensive previous work experience, and high achievement as manager of the Dental Technology team, it is disingenuous to assert that the reduction in force produced a residual work force containing no unprotected persons who were performing at a level lower than that at which Luh was performing.

. According to Luh, she even sent copies of Martin's derogatory e-mails to Izod in order *157 to get his advice on how to deal with that situation. J.A. 190-93.