**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 05-1240**

---

ELLICE LUH,

Plaintiff - Appellant,

versus

J. M. HUBER CORPORATION,

Defendant - Appellee.

---

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Catherine C. Blake, District Judge.  (CA-
03-1023-CCB)

---

Argued:  February 1, 2006          Decided:  December 21, 2006

---

Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.

---

Affirmed by unpublished opinion.  Judge Widener wrote the opinion,
in which Judge Niemeyer concurred.  Judge Gregory wrote a
dissenting opinion.

---

**ARGUED:** John Michael Clifford, CLIFFORD & GARDE, Washington, D.C.,
for Appellant.  John F. Meyers, SEYFARTH SHAW, L.L.P., Atlanta,
Georgia, for Appellee.  **ON BRIEF:** Jason M. Zuckerman, CLIFFORD &
GARDE, Washington, D.C., for Appellant.  Susan Jeanblanc Cohen,
SEYFORTH SHAW, L.L.P., Washington, D.C.; Cheryl B. Legare, SEYFARTH
SHAW, L.L.P., Atlanta, Georgia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

WIDENER, Circuit Judge:

This case is an appeal from an entry of summary judgment against the plaintiff, Ellice Luh, in a Title VII race and sex discrimination lawsuit against her employer, J.M. Huber Corporation.

The plaintiff alleges that she was terminated from her position due not only to her race, but also because she was a woman who had turned down an unwanted sexual advance from a fellow management employee. Huber maintains that it terminated her as part of a general restructuring of its business following marked downturn in profitability. The district court granted summary judgment for Huber, finding that Mrs. Luh had failed to proffer support for a finding that the reasons advanced by Huber were pretextual. We affirm.

I.

The plaintiff, Ellice Luh, is a Chinese-American woman. She earned an engineering Ph.D. from the University of California at Berkeley in 1988. Following graduation, she spent nine years working for the W.R. Grace Co., developing products for paper coating, electromagnetic glass shielding, and dental silica applications, among others. She was hired away from this position by Huber in June 1997 in order to be the Technology Manager for the company's dental group located in Havre de Grace, Maryland. Huber

is a major supplier of engineered materials and research and development services.

While with Huber, Mrs. Luh's work was on the development of dental silicas, which are the abrasives used in toothpaste.

Because Mrs. Luh joined Huber shortly before it undertook a large restructuring of its operations, she had four different supervisors during her time with the company. Her first supervisor, Bob Klem, had also initially interviewed her for the position. Following Klem was Jorma Sakko. Sakko was eventually promoted, and Mrs. Luh was then supervised by Mike Withiam, who then reported to Sakko. In April 2000, Tom Izod was hired as the Director of Technology for the company, and took over the supervision of Mrs. Luh. Our recitation of some of the foregoing sequences of the supervisors may be slightly out of order.

In early 2000, as the result of a large loss in profits, Huber undertook a number of measures to reduce labor costs. These measures included the decision by Izod to combine the Dental Technology Group with the Food, Feed, Health and Care Group into a new group called the Consumer Technology Group. The management of these two groups would be combined, and redundant positions would be eliminated. The plaintiff's was one of the eliminated positions.

Philip Block, who held a position with the Food, Feed, Health and Care Group analogous to Mrs. Luh's with the Dental Group,

received his Ph.D. from the University of North Carolina in 1993. Prior to working at Huber, he worked for Johnson & Johnson developing surgical gloves, sterilization compounds, and skin care products. He also held a position at Unilever developing detergents and soaps. In his only performance review at Huber prior to the restructuring, Block had apparently been criticized by some subordinate employees for his management style, including his decision to cancel a morning coffee break.

Prior to selecting between Mrs. Luh and Block, Izod met with each of them, Mrs. Luh on April 19, 2000, and Block the following day. During her meeting, Mrs. Luh informed Izod she was having problems with the other managers at Huber, and stated that, as a result, she could not see herself with the company in five years. This led Izod to conclude that she "was not interested in expanding her expertise outside of the Dental Technology area." In contrast, Block spoke about his work in skin care and detergents and told Izod that he was thinking about new uses for existing products manufactured by the company. This lead Izod to conclude that Block was a "go-getter."

Izod ultimately selected Block to be the technology manager of the Consumer Technology Group. Izod then informed Mrs. Luh that her position was being eliminated, and her employment would be terminated effective June 30, 2000. She was offered a severance package and outplacement services.

4

Block's own time at Huber was limited, however. He was removed from his new position and left Huber entirely by March 2001. Mrs. Luh says that Block later indicated to her that he had been asked to leave due to inadequate performance of his duties, which, however, is not consistent with his performance review in the record.

Mrs. Luh also was not the only Asian eliminated during Izod's restructuring. Three of the six total employees who were terminated were Asian, although before the terminations, the group had 52 employees, 39 of whom were white and five were Asian.[1]

Following her termination, Mrs. Luh filed a complaint with the EEOC on February 20, 2001, alleging race and gender discrimination as well as quid pro quo harassment. The EEOC issued her a notice of right to sue, after which she filed this lawsuit on April 10, 2003.

The district court entered summary judgment in favor of Huber on all of Mrs. Luh's claims on January 25, 2005. Specifically, it determined that she had not provided evidence to survive summary judgment by establishing a pretext under the McDonnell Douglas test. Further, the district court determined that Mrs. Luh could not sustain her quid pro quo claim,[2] as she did not provide any

---

[1]The number of employees involved in the layoff may vary slightly, depending on the place in the record which is read.

[2]The parties considered the claim of Mrs. Luh, that one Martin had suggested a sexual liaison, to be a claim quid pro quo. Martin

5

support for the claim that her rejection of a sexual advance had been a motivating factor in the decision to terminate her, for much the same reason that she could not demonstrate pretext. Martin was not her supervisor and did not make the decision to terminate her. This appeal of the discrimination claim followed. Mrs. Luh has not pursued an appeal of the district court's decision on her quid pro quo claim. Br., pp.1-2 ("STATEMENT OF ISSUES PRESENTED FOR REVIEW.")

## II.

We review the grant or denial of summary judgment de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate when the materials before the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In her appeal, Mrs. Luh takes issue with a number of evidentiary rulings and interpretations made by the district court in the process of granting summary judgment. In examining a motion for summary judgment, a district court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton

---

denied the claim.

6

Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). However, the court must still abide by "the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotations omitted).

In discrimination cases such as this one, we apply the McDonnell Douglas burden-shifting scheme. Under this framework, the plaintiff is responsible for setting forth a prima facie case of discrimination. After that, the burden shifts to Huber to present a legitimate, non-discriminatory justification for its actions. This justification "must be legally sufficient to justify a judgment for" Huber. Tex. Dept. Comm. Affairs v. Burdine, 450 U.S. 248, 255 (1981). Once Huber has done so, the plaintiff bears the burden of demonstrating that the proffered reasons were merely pretextual and the true reason for Huber's actions was discriminatory animus.

A.

Most issues that Mrs. Luh raises in her appeal take issue with the district court's use of Izod's testimony to find that Huber had shown a legitimate, non-discriminatory justification for terminating her.

She argues that reliance on Izod's testimony at the summary judgment stage is improper. She bases this position on a quotation

7

from <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000), which states that "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"

We agree with the district court that Mrs. Luh's interpretation of <u>Reeves</u> is inappropriate in the present case. <u>Reeves</u> states the noncontroversial position that witness testimony that the jury is not required to believe cannot be used to sustain a summary judgment decision, since the jury is not required to believe their testimony. <u>Reeves</u>, 530 U.S. at 151. However, the Court has long held that there are exceptions to this rule. For example, in <u>Chesapeake & Ohio R. Co. v. Martin</u>, 283 U.S. 209 (1931), the Court held that this rule "does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt." 283 U.S. at 216. Instead, the testimony must display some indicia that it is not credible- whether by betraying a lack of candor, or by being unsettled by cross-examination, or by being contradicted by "proof or circumstance," especially when it could readily have been shown to be inaccurate had it been. <u>Chesapeake & Ohio R. Co.</u>, 283 U.S. at 216.

Recognizing this, Mrs. Luh has claimed that Izod's testimony was internally contradictory and that, moreover, it contradicted evidence that she introduced. Neither of these is sufficient to save her claim, however.

We have held that an employer offering different justifications for the dismissal of an employee, one good and one bad, will justify a conclusion that the good justification is pretextual. Alvarado v. Bd. of Trs. of Montgomery Comm. Coll., 928 F.2d 118, 123 (4th Cir. 1991). However, Mrs. Luh fails to establish such contradiction in Izod's testimony before the court.

The first instance she identifies as a contradiction stems from the April 5, 2001 statement that Huber made to the EEOC, which she claims indicated that the decision to hire Block was a joint one by Izod and Rob Edmonds, another Huber executive. The relevant passage in the letter was that "Tom Izod, the Director of the Consumer and Industrial Global Technology, in discussions with Rob Edmonds, the Vice President of Consumer and Industrial Markets, looked carefully at each employee's managerial strengths, and determined that Block was far better qualified for this management position." Mrs. Luh contends that this contradicts Huber's response to an interrogatory where it stated simply that "Tom Izod selected Philip Block... Mr. Izod made his selection after assessing the managerial skills that he believed were important..." She adds that these statements, indicating careful consideration of

9

the choice, should be seen as conflicting with Izod's testimony that "time was of the essence" in making the decision. We do not believe that she reads the record fairly. First, Edmonds was Izod's superior, and had to approve Izod's decision. Mrs. Luh presents no evidence, however, that Edmonds did anything other than approve Izod's choice. Simply because Izod did not have authority to act without first obtaining the approval of his supervisor is not sufficient to find that any statement that he, Izod, "made the decision" is false or otherwise a misrepresentation that undercuts his testimony. Similarly, the mere fact that he had to reach a conclusion quickly does not mean that, in so doing, he did not conduct an adequate assessment of Mrs. Luh's qualifications as compared to Block's. Without evidence to support her claims, Mrs. Luh's attempt to import contradictions into these statements fails.

Similarly, another claimed contradiction is based upon a misreading of the record. She contends that Huber indicated in its interrogatories that there was a reduction in force plan approved by the company's human resources department, but insists that, in actuality, there was only a list of potential terminations maintained by Izod. Examining the interrogatory response, however, demonstrates that the two are not in conflict. The response states that "the HEM management requested that HEM Human Resource Managers and/or Directors prepare a reduction in force plan. In response, Tom Izod made the determination that [Mrs. Luh's and Block's

10

departments be combined], thereby eliminating a technology manager position."  Mrs. Luh has not introduced any evidence that Izod's list was not, in fact, the reduction in force plan that was requested by Huber's human resources department, and we decline to imply a contradiction where none exists based on the record.

Finally, Mrs. Luh attempts to demonstrate an inconsistency in Izod's testimony concerning Block's skill at managing employees. The first statement she highlights is drawn from a letter to the EEOC, in which Huber's counsel stated that "Izod and Edmonds felt that Block was the superior manager in terms of planning, effective leadership, and approaching issues with a team orientation."  This, she says, is contrary to Izod's statement in his deposition that Block was "an effective manager of people."  Further, Mrs. Luh argues that both of these statements contradict Izod's knowledge that Block's staff was very upset at the changes he introduced to his group, particularly reducing their coffee break time.

This claimed contradiction is also without merit.  First, although "superior" is often used to describe objectively excellent performance, it is also a comparative term, and the statement in the EEOC letter clearly indicates that Izod and Edmonds believed that Block was a superior manager to Mrs. Luh, and that they were not attempting to provide an objective assessment of his capabilities.  This is confirmed by reading the full quotation from Izod's deposition.  He stated that Block is "an effective manager

11

of people.  He had some management skills in the past... you can understand both of them [Block and Mrs. Luh] are young managers."

Secondly, we disagree that these statements are opposite to the staff complaints.  As we have noted, "it is the perception of the decision maker that is relevant... not the opinions of [a plaintiff's] co-workers or other third parties."  Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444 (4th Cir. 1998).  As a result, we look not to Block's subordinates' complaints, rather to Huber's own assessment of Block's performance.  Here, Huber presented ample evidence that Izod considered Block's performance satisfactory, and these staff complaints a good thing.  Izod considered the Havre de Grace facility "the laziest place in our organization," and was pleased that Block had instituted firmer policies to bring the facility more in line with the standards in the rest of the company.  At no point did Mrs. Luh introduce evidence contrary to this explanation by Huber.

Thus, we find no error in the district court's determination that Huber advanced a nondiscriminatory justification for its termination of Mrs. Luh.

B.

Since Huber proffered a nondiscriminatory justification for its actions, the burden then shifted back to Mrs. Luh to establish pretext.  The district court determined that she had not done so.

12

She appeals this determination, arguing that the district court improperly disregarded evidence that she had introduced that was sufficient to send the case to the jury.

Mrs. Luh's claim to have established pretext rests on three separate foundations. First, she contends that the evidence shows that Izod's evaluation of her and Block's qualifications was unreasonable. Second, she argues that evidence of Block's failures in the position demonstrate that she was discriminated against. Finally, she contends that the district court improperly ignored statistical evidence that she introduced. We disagree, and find that the district court's actions in each of these instances was proper.

On the first issue, we have held that a plaintiff may establish pretext by demonstrating that the decisionmaker conducted the selection process in a "peculiarly informal" manner in order to discriminate against the plaintiff. Dennis, 290 F.3d at 647. Mrs. Luh contends that Izod's evaluation process fit this category. She focuses on what she sees as Izod failing to investigate her employment record with Huber. Her evidence for this is Izod's admission at deposition that he was unaware she was in the company's Leadership Development Program in 1997 and that he had reviewed only the most recent of her annual performance evaluations. Additionally, she argues that Izod did not consult with any of her prior managers.

13

Again, we look to our decision in <u>Tinsley</u> that "it is the perception of the decision maker that is relevant... not the opinions of [a plaintiff's] co-workers or other third parties." 155 F.3d at 444. Here, it is clear that Izod had established criteria for the promotion that he carried to completion. During his interviews with both Block and Mrs. Luh, Izod stressed that he was emphasizing forward-thinking ability and creativity, rather than merely past performance. Additionally, Izod testified that he received and considered information from both Block and Mrs. Luh's supervisors, peers and subordinates. Her contention that he disregarded the various letters written in support of her candidacy appears to be based upon nothing more than his decision to select Block for the position rather than her. An assertion such as this, without supporting evidence, is not sufficient to demonstrate pretext and defeat summary judgment.

Apart from improprieties in the selection process, we have held that post-selection performance failures are relevant to a pretext inquiry when the selectee exhibited similar performance failures during the decision process and where the decisionmaker was aware of these failures. <u>Grano v. Dept. of Development</u>, 637 F.2d 1073, 1081 (6th Cir. 1980). Mrs. Luh argues that Block had later difficulties at Huber, which is denied, and that his departure from Huber should ground a finding of pretext.

14

We decline to consider this issue, as Mrs. Luh did not raise the issue in the district court. Issues raised for the first time on appeal, as this, generally will not be considered. Nat'l Wildlife Fed. v. Hanson, 859 F.2d 313, 318 (4th Cir. 1988). In any event, Block's Performance Summary signed by Izod and Edmonds contradicts the assertion.

Finally, we turn to the district court's consideration of Mrs. Luh's statistical evidence. Her position is copied verbatim from her brief on appeal, pp. 58, 59:

> Before the restructuring/reduction in force, the workforce population managed by Izod consisted of 46 employees, of whom 39 were White, two were Black and five were Asian. (JA 854; JA 706-720) Thus, Asians made up less than 11% of Izod's workforce, while whites accounted for 85% and Blacks 4%.

> From this group, Izod selected or helped to select a total of six employees for dismissal in connection with the "restructuring." Of these, three were Asian, including Plaintiff, and three were White. (JA 720-21) Thus, 50% of the employees selected for "definite" termination in Izod's plan were Asian, and 50% were white. However, the three whites whom Izod selected for "definite" termination represented only 7.5% of the 39 whites in his workforce. (JA 724) By contrast (as Izod acknowledged), the three Asians whom Izod selected for "definite" termination represented 60% of the five Asians in his workforce. (JA 723) Thus, his Asian employees were eight times more likely than their white co-workers to be selected by Izod for termination in the reduction in force.

> In sum, it cannot be denied that the burden of Izod's termination decisions fell disproportionately upon the Asian employees he supervised, at a rate that evidences unlawful intent.

15

The district court analyzed this evidence and decided that "Luh has not provided sufficient evidence to suggest that the reasons offered by Huber are false or a pretext for racial or gender discrimination." There was no expert testimony as to methodology justifying the sought conclusion of discrimination or relevance of the statistics to the plaintiff's claim. In such a case we have held that "[i]f a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence." Carter v. Ball, 33 F.3d 450, 457 (4th Cir. 1994). Carter relied on Williams v. Cerberonics, Inc., 871 F.2d 452, 455 n.1 (4th Cir. 1989) for the same proposition in which a plaintiff had sought to rely on bare statistics without testimony as to why the statistics were compiled or how they were related to the plaintiff's claim. In the case before us, in addition to the absence of such evidence relating the statistics to the case, the district court noted the small number of people involved, that some of the Asian employees involved were from a different facility over which Izod only had partial responsibility and that Huber articulated an individual reason for Mrs. Luh's layoff.

We conclude that the district court properly analyzed the evidence presented in this case. We find no error in the reasoning set forth by the district court in its opinion, either as to Huber's demonstration of a legitimate, nondiscriminatory

16

justification or as to Mrs. Luh's failure to establish the necessary showing of pretext.

The judgment of the district court is accordingly

AFFIRMED.

GREGORY, Circuit Judge, dissenting:

Ellice Luh, a former employee of J.M. Huber Corporation ("Huber"), appeals from the United States District Court for the District of Maryland's grant of summary judgment in favor of Huber. Luh, who is an Asian-American female, alleges that Huber denied her a promotion and terminated her employment on the basis of her race and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (2000), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (2000). Because Luh has produced sufficient evidence to demonstrate that Huber's proffered reasons for not promoting her to the new manager position and terminating her employment were false or, at best, dubious, she has established a triable issue regarding pretext for discrimination. Therefore, I respectfully dissent.

I

The following is a recitation of the facts construed, as they must be, in the light most favorable to Luh, the nonmovant for summary judgment. Luh earned a Ph.D. in engineering from the University of California at Berkley in 1988. For the next nine years, Luh worked for W.R. Grace Company, in the areas of research and product development. During her tenure at W.R. Grace, Luh helped to develop, <u>inter alia</u>, aluminum nitrate for semiconductors,

18

silicon carbide whiskers, non-moire electromagnetic shielded glass, ceramic composite materials, and dental silica applications.

In 1997, Luh left W.R. Grace to accept a position as the Technology Manager for Huber's Dental Group, part of which later became Huber's Engineered Materials Division ("HEM"). Huber, which is headquartered in Atlanta, Georgia, is a diversified, multinational supplier of engineered materials, natural resources, and technology-based services. Luh worked in the area of dental silicas at Huber's Havre de Grace, Maryland facility from September 21, 1997, until her termination on June 30, 2000. During her three-year tenure with Huber, Luh had several different supervisors, including Robert Klem, Jorma Sakka, and Mike Withiam.

Between 1997 and 2000, Luh received three generally positive annual performance reviews from her supervisors. On her 1997 annual performance review, Klem concluded as follows:

> Ellice has rapidly brought herself up to speed with her role as Dental Technology Manager. She has gained the respect of her peers in our Division. I expect Ellice will accelerate and progress in Dental Technology in 1998. Ellice clearly has the potential to be a future leader in Huber.

J.A. 147. Similarly, at the end of 1998, Klem concluded that Luh had "rapidly matured as a leader for our Dental Technology team." J.A. 155. Further, Klem praised Luh for her "high degree of dedication and professionalism" and concluded that these attributes would carry Luh "forward for Huber." Id. Also in 1998, Huber's President of Engineered Materials, David Hill, selected Luh to

19

participate in the company's Long Term Incentive Pay Plan. See J.A. 194. In so doing, Hill praised Luh for her contributions and stated that the viability of the HEM division depended on "the talents and expertise of people like you." Id.

In Luh's 1999 evaluation, Withiam, who had replaced Klem as Luh's direct supervisor, noted that "[d]espite the commercial and technical success, significant concerns remain in the area of relationships and leadership. Time spent on relationship conflicts impacted morale and cohesiveness of the [Personal Care team]." J.A. 162. Nevertheless, Withiam concluded that Luh was "bright, an excellent communicator, [was] well liked and [added] greatly to the overall depth of our effort in Personal Care." Further, Withiam stated that he looked forward to Luh "taking an active role, beyond oral care, in the Consumer Products team." J.A. 162.

During her tenure as the Technology Manager for Huber's Dental Group, Luh oversaw the development of what became known as the "Janis Project," which was an effort to develop a new dental silica product that would clean teeth without being too abrasive. Luh contends that one of the staunchest supporters of the Janis Project was Michael Martin, then Huber's Global Business Leader for Oral Care. In that capacity, Martin testified that he had the authority to recommend either the approval or termination of technological oral care research projects to his direct supervisor, Ron Cole, Huber's Global Consumer Leader. See J.A. 982-84. According to

Luh, Martin suddenly withdrew his support for the Janis Project immediately after she rebuffed his sexual advances at an American Association for Dental Research Convention in Washington, D.C., on April 5, 2000.

During the convention, Luh, Martin, and Rick Cates, Huber's silica products account manager, hosted a private dinner party at the Georgetown Club for employees of Colgate, an important Huber customer. Luh testified that, after the dinner, she, Martin, and Cates returned to the lobby bar of Martin's hotel to discuss the convention and business generally. J.A. 427-28. After Cates left the table to pay the bill and use the restroom, Martin remarked to her that it was wonderful for employees to have the opportunity to get to know each other on a more social level. J.A. 430. Luh testified that Martin then mentioned that he would be "very discreet," as he had been in relationships with other women. Id. According to Luh, Martin stated that neither his nor Luh's marriage should "interfere with an opportunity to get to know each other better." Id. Luh contends that she rebuffed Martin's advances by telling him that he had had too much wine and she would see him at work the next week. J.A. 431. Luh testified that she told Cates about Martin's overture the following week. Cates testified that Luh had told him about Martin's advances "within the next few days during a meeting." J.A. 1168. Further, Cates testified that Martin had been "drinking a lot that night" and that someone at the

21

dinner had remarked that "Michael is pretty bombed." J.A. 1169, 1165. Martin denied drinking alcohol the night of the Colgate dinner. See J.A. 991. Further, Martin denied making a sexual overture towards Luh. See J.A. 992.

Despite his initial support for the Janis Project, Martin undertook a concerted effort to postpone the filing of the Janis patent application, beginning two days after the convention in Washington, D.C. On April 7, 2000, Martin sent a three-page memorandum to a select group of HEM supervisors, including Cates and Ron Cole, but conspicuously excluding Luh. In this memorandum, Martin asserted as follows:

> I might have been a little slow in getting up to speed on all aspects of Janis, a very complex project [sic] but our meetings in Washington DC [sic] with Colgate, from a business standpoint, lead me to strongly ask for postponing the filing of the Janis patent application in its current form.

J.A. 175. Over the course of the next week, Martin wrote multiple e-mails and letters to HEM supervisors, in which he described the Janis project as a "hoax" and blamed these shortcomings on Luh because she spent too much time on customer relations, instead of managing technology. J.A. 1033, 1175. Cates testified that the timing of Martin's aspersions was "odd," given that just a week before, at the dental convention in Washington, D.C., "he was all for it." J.A. 1174. Cates further testified as follows:

> As a matter of fact, he [Martin] was responsible for half the presentation [about Janis] with Colgate the next day

22

> . . . and was very positive about the whole thing, and then he really didn't get involved with it anymore.

J.A. 1174-75.

On April 15, 2000, in the midst of Martin's campaign against Luh and the Janis Project, Thomas Izod ("Izod") joined Huber as Director of Technology and became Luh's immediate supervisor. As Director of Consumer and Industrial Technology, Izod had supervisory authority over Luh's Dental Technology Group and the Food, Feed Health, and Care Group ("FFH&C"). In this role, Izod asserted that he was responsible for reducing the research and development costs of both the Dental Technology Group and FFH&C. Accordingly, Izod created a consolidation plan, whereby he combined the Dental Technology Group and the FFH&C group into a single entity, the new Consumer Technology Group.

Izod testified that one of his goals in consolidating the two groups was to de-emphasize the dental products and "move more aggressively into the personal care cosmetics area." J.A. 646. Within two weeks of his hiring, Izod decided to retain either the manager of the Dental Technology Group (Luh) or the manager of the FFH&C, Philip Block, but not both of them. See J.A. 637.

Like Luh, Block had impressive educational credentials, having obtained a science Ph.D. from the University of North Carolina in 1993. Thereafter, Block worked for Johnson & Johnson and Unilever in the areas of sterilants, surgical gloves, and skin care. As Block had only joined Huber as manager of FFH&C in November 1999,

23

he had not been employed long enough to have had a performance review. Over the course of two months, Izod undertook an evaluation of these two managers. According to Izod, his evaluation process consisted of a single one-hour interview with each manager and discussions with various Huber supervisors about each manager's experience, past performance, and capabilities. Those discussions included at least one talk with Martin sometime between April and June 2000. Izod was aware of Martin's efforts to communicate to other supervisors his concerns about the Janis Project. Izod admitted that Martin talked to him about Luh and those concerns. See J.A. 630, 653, 655–56.

At the same time Izod was evaluating Luh and Block, he began to evaluate the rest of the employees under his supervision. Subsequently, Izod came up with a reduction-in-force plan for the new Consumer Technology Group. Izod memorialized his reduction-in-force plan on a single sheet of paper. Specifically, Izod listed each of the forty-six employees from the Dental Technology Group and FFH&C in one of three columns on a single sheet of paper. Izod titled the first column, which listed thirty-four employees, "KEEP OR MOVE," the second, which listed seven employees, "POTENTIAL LEAVE," and the third, which listed five employees, "DEFINITE LEAVE." Izod placed Luh in the potential leave category. From this initial list, Izod and his supervisor Rob Edmonds eventually selected a total of six employees for termination.

Before Huber implemented Izod's reduction-in-force plan in June 2000, the workforce population managed by Izod consisted of forty-six employees, of whom thirty-nine were Caucasian, two were African American, and five were Asian American. Thus, Caucasians constituted 85% of the existing workforce, while Asian and African Americans constituted 11% and 4%, respectively. Of the six employees selected by Izod and Edmonds for termination, three were Asian American and three were Caucasian. Thus, 50% of the employees selected for termination under the reduction-in-force plan were Asian American, thereby reducing by 60% Izod's Asian American workforce.

On June 27, 2000, Huber informed Luh that she had been selected for termination due to restructuring. At or about the same time, Izod selected Block to be Technology Manager for the Consumer Technology Group. After declining Huber's offer of a severance package and outplacement services, Luh filed a timely charge of discrimination with the Baltimore District Office of the United States Equal Employment Opportunity Commission ("EEOC"). After the EEOC issued a determination of reasonable cause that Luh was discharged from Huber on account of her race and gender and because of quid-pro-quo sexual harassment, Luh filed a timely suit in the District of Maryland. In her complaint, Luh alleges that Huber discriminated against her on account of her race and gender, while favoring a less qualified Caucasian male employee, Philip

25

Block.  Further Luh alleges that Huber's decision not to select her was influenced by false accusations of poor performance, made by a manager whose sexual overtures she had rebuffed.

After discovery, Huber filed a motion for summary judgment on all three counts.  The district court granted the motion without hearing oral argument.  In so doing, the district court assumed for the purposes of summary judgment that Luh had established a prima facie case of racial and gender discrimination.  However, the court held that these claims failed because Luh had not put forth sufficient evidence to suggest that the reasons cited by Huber were pretext for discrimination.  J.A. 1259.  The district court also granted summary judgment on the quid-pro-quo claim, concluding that even if Michael Martin had in some way influenced Izod's decision, Huber could not be held liable for this impermissible influence. J.A. 1260.  This appeal followed.


II

Although Luh raises a number of sub-issues relating to the district court's application of Title VII's burden-shifting framework, the central issue to be decided is whether the district court correctly granted summary judgment for the defendant on Luh's claims of race and gender discrimination under Title VII and § 1981.

26

This court reviews de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). Ultimately, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII claim by either of two methods of proof: (1) using a "mixed-motive" framework, whereby the plaintiff demonstrates, by way of direct or circumstantial evidence, that race or sex discrimination motivated the employer's adverse employment decision; or (2) using the familiar burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), whereby the plaintiff demonstrates, by way of circumstantial evidence, that the employer's proffered reason for the adverse employment action is merely a pretext for racial or

27

gender discrimination.  The district court relied primarily on the burden-shifting framework to analyze the summary judgment motion and Luh relies exclusively on this framework to argue that summary judgment was inappropriate.[1]

Under the <u>McDonnell Douglas</u> burden-shifting framework, a plaintiff must first establish a prima facie case of race or gender discrimination.[2]  <u>See</u> <u>Hill v. Lockheed Martin Logistics Mgmt.,</u> <u>Inc.</u>, 354 F.3d 277, 285 (4th Cir. 2004)(en banc).  Assuming the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to proffer a permissible, non-discriminatory basis for taking the adverse employment action.  <u>See</u> <u>id.</u>  In a reduction-in-force context, a plaintiff must show that (1) she is a member of a protected class; (2) she was selected for discharge from a larger group of candidates; (3) she was performing at "a level equivalent to the lowest level of those of the group retained"; and (4) "the process of selection produced a residual work force of persons in the groups containing some unprotected

---

[1]In the concluding paragraphs of its memorandum opinion, the district court briefly asserted that Luh's claims also failed under a mixed-motive framework because the circumstantial evidence presented did not establish that race or gender was a motivating factor in her termination.  <u>See</u> J.A. 1260.  Luh does not take issue with this alternative holding, relying solely on a burden-shifting framework to attack the propriety of the district court's grant of summary judgment.

[2]The <u>McDonnell Douglas</u> framework is used in both Title VII and § 1981 cases.  <u>See</u> <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 189 (4th Cir. 2001).

persons who were performing at a level lower than that at which she was performing."[3] O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 546 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996).

If the defendant proffers a permissible, non-discriminatory basis for its action, then the initial presumption of discrimination is rebutted and the burden of production shifts back to the plaintiff to prove that the defendant's proffered reason is mere pretext for discrimination. See id. A plaintiff can accomplish this by showing that the employer's proffered reason is false because "in appropriate circumstances, the trier of fact can

_____

[3]Luh argues that the reduction-in-force standard is inapplicable because Huber was choosing between only two people for the manager position instead of choosing from a larger group of people. In so doing, Luh relies on this court's decision in Karpel v. Inova Health Sys. Servs. Inc., 134 F.3d 1222, 1228 (4th Cir. 1998). In that case, the plaintiff alleged that she had been subject to race discrimination after being terminated from her employment for unsatisfactory performance. In the context of that case, we recognized that in order to establish a prima facie case of discrimination, the plaintiff would have to demonstrate (1) that she was a member of a protected class; (2) that she was qualified for her job and her performance was satisfactory; (3) that, in spite of her qualifications and performance, she was fired; and (4) the job remained open to similarly situated employees after her termination. Id. Thus, to the extent that the plaintiff in Karpel was not laid off as part of an overall restructuring or reduction in force, but for allegedly unsatisfactory job performance, the prima facie standard set forth in that case is inapplicable here. As Huber correctly notes in its brief, the standard for establishing a prima facie case in the reduction-in-force context does not change depending on the number of employees subject to termination by the employer. So long as the employee was terminated as a result of her employer's reduction-in-force plan, we will apply the prima facie standard articulated in O'Connor.

29

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

The district court assumed that Luh has established a prima facie case of racial and gender discrimination.[4] Therefore, I now turn to the more difficult questions of whether Huber proffered legitimate, non-discriminatory reasons for her termination, and, if so, whether Luh has demonstrated that these proffered reasons were pretext for discrimination. Ultimately, for the reasons discussed below, I conclude that Huber's proffered justification is legally insufficient to justify the grant of summary judgment in its favor on the race and gender discrimination claims.

As this court recently recognized in Mereish v. Walker, 359 F.3d 330 (4th Cir. 2004), an employer seeking to rebut a prima facie showing of discrimination is not required to persuade the court that "the proffered reason was the actual motivation for . . . [the] decision." Id. at 335. Instead, the employer "must merely

---

[4]Huber suggests that had the district court analyzed the evidence to determine whether Luh had established a prima facie case of discrimination it likely would have concluded that she did not because there was little to no evidence to satisfy the fourth prong. The record evidence belies this argument. Considering Luh's stellar educational background, extensive previous work experience, and high achievement as manager of the Dental Technology team, it is disingenuous to assert that the reduction in force produced a residual work force containing no unprotected persons who were performing at a level lower than that at which Luh was performing.

articulate a justification that is legally sufficient to justify a judgment in his favor." Id. (internal quotation marks and citations omitted). Although an "employer has discretion to choose among equally qualified candidates, provided the decision is not based on upon unlawful criteria . . . ," Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981), the overwhelming evidence in this case demonstrates that Luh was far more qualified than Block with respect to the skills Izod professed to be pertinent to his decision.

Consistent with his intention to retain only one manager, Izod testified that he undertook a comparative evaluation of Luh's and Block's credentials. See J.A. 643-652. Izod testified that he conducted a single, one-hour interview with each candidate and solicited feedback about each manager from various Huber supervisors. See J.A. 640-655. Huber asserts that Izod ultimately decided to retain Block over Luh because he concluded that Block stood out in the following areas: (1) customer interaction, (2) planning, (3) leadership, (4) presentation skills, (5) team orientation, (6) new idea concepts, and (7) field expertise. J.A. 640. The record evidence strongly indicates, however, that Izod failed to consider and credit a plethora of relevant evidence pertaining to Luh's strengths in these areas. Accordingly, I find that a jury could reasonably conclude that Luh was more qualified

31

than Block and, thus, infer that Izod's decision to select Block over Luh was indicative of pretext.

With respect to the planning and new idea concepts criteria, Huber asserts that Izod concluded that Block was more qualified than Luh. Izod testified that during his one-hour interview with Luh, "she came across as not being an individual that was terribly interested in other things outside the dental area." J.A. 644. By contrast, Izod testified that he found Block to be interested in the development of new consumer products, particularly in the area of cosmetics. See J.A. 802. Izod testified that he was particularly impressed with Block's ideas for fragrance carrying, cosmetic samples that Block had recently presented at a cosmetic show, and Block's desire to develop the skin care area. J.A. 909. Izod's overall impression of Block was that, contrary to Luh, he was someone who was "going to step up and do something that's going to create the change that's of value to the company." J.A. 645.

Although Huber contends that Izod concluded that Block was more qualified than Luh in terms of the planning and formulating consumer products, Izod conceded at his deposition that he had never actually asked Luh about her ideas for expanding research and development in this area. See J.A. 644. Further, Izod admitted that he had failed to ask Luh whether she had attended any cosmetic shows, or whether she had any familiarity with the cosmetics industry. J.A. 688-69. Indeed, had Izod taken the time to review

32

Luh's previous employment evaluations, he would have discovered that Luh had attended a global cosmetics convention in London in 1998 and that Luh's team's "[d]ye-absorbing silica granules [had] received positive feedback from 5 different companies in Europe." J.A. 877. Furthermore, Izod's purported conclusion that Block was more innovative than Luh is dubious in light of the fact that Block had only had eight months experience as a product manager at Johnson and Johnson, where he helped to develop latex gloves, and had only worked for Huber for a period of six months when Izod began his evaluation. To the contrary, Luh had worked for Huber for a period of three years and was instrumental in the research and development of numerous dental and consumer products, including cosmetics. In short, Block did not adequately consider Luh's knowledge, interest, and experience in consumer products and overstated Block's qualifications in this area.

Turning to the proffered customer relationships and presentation skills criteria, the evidence indicates that Izod disregarded Luh's considerable strengths in these areas. Unlike the relatively new Block, Luh had cultivated relationships with many of the company's major dental and consumer products customers over the course of her three-year tenure with the company. Luh's 1998 performance evaluation concludes that Luh had "demonstrated good customer focus during the past year through her address of the various long-term programs and short-term technical service needs

33

of our customers." J.A. 152. Importantly, even Michael Martin praised Luh's "acumen" in the area of customer relations. See J.A. 997. Izod even conceded that he had been informed "by a number of people" that Luh's customer presentation skills were "very good." J.A. 640. Because of his relatively short tenure with the company, there is no comparable evidence in the record regarding Block's performance in these areas. However, Izod testified that he had been told that Block had performed well at a European cosmetics convention. See id.

As for leadership and team orientation skills, it is apparent that Izod disregarded a wealth of evidence of Luh's strengths in these areas. Huber asserts that Izod concluded that Luh would not be an effective leader, mainly because Luh told Izod during her interview that she was "having difficulty" with "some of the current management," specifically Michael Martin. J.A. 417-418. During the interview, Luh told Izod about Martin's negative e-mail campaign against her and the Janis Project. J.A. 418.[5] Further, Luh confided in Izod that if these problems persisted, she could not see herself at Huber for another five years. J.A. 420. Izod testified that he concluded from this conversation that Luh was "so wound up" in a number of areas concerning her history, that she did not seem "terribly interested in other things outside of the dental

[5]According to Luh, she even sent copies of Martin's derogatory e-mails to Izod in order to get his advice on how to deal with that situation. J.A. 190–93.

area." J.A. 644. Accordingly, Izod concluded that Luh would not be an effective leader of his new Consumer Technology team. See id.

In reaching his conclusion, Izod admitted that, although he had read Luh's most recent annual evaluation, he had not reviewed her other evaluations, which had noted Luh's initiative and leadership ability. J.A. 668-69. Further, Izod admitted that he had not been aware that Huber had selected Luh for its leadership development program in 1998 or that she had been selected for a long-term retention contract. J.A. 668. Izod even admitted that he hadn't known that Luh "had been successful at Huber." J.A. 675. Izod defended these omissions by stating as follows:

> I'm trying to evaluate people. As I said earlier on, Mr. Clifford, I was trying to find out who I wanted on my team. Okay? I was trying to get from these one-on-ones, these introductory type one-on-ones I wanted to get a feel for the type of person we had. I wasn't really interested in going back and looking at a lot of history quite frankly because history is just - I'm looking to make something start again, get off to a fresh start in an organization . . . .

J.A. 675.

I also note that Izod disregarded the concerns of a number of Huber employees with respect to Block's leadership and team orientation skills. During his deposition, Izod conceded that even before he selected Block, he was aware that some employees of the FFH&C team were unsatisfied with Block's heavy-handed leadership style. See J.A. 649-51. Similarly, Richard Cates testified that

35

a number of FFH&C had voiced concerns about Block.  <u>See</u> J.A. 1139-41.  Izod downplayed these concerns as expected disgruntlement by employees who were resentful of their new manager for making them work harder.  <u>See</u> <u>id.</u>  I note, however, that Block resigned his position as Consumer Technology Manager within six months and left the company altogether within a year of Izod's hiring.  Although Izod claims that Block left voluntarily, there is significant evidence that suggests otherwise.  At her deposition, Luh testified that Block later told her that Izod had asked him to resign.  This scenario is more consistent with Block's January 5, 2001, performance evaluation, in which Izod concluded as follows:

> My main concern is the initial negative response to Phil by a number of people outside the group in other departments.  There must be a problem here because the issue crosses several departments, yet I can't identify an exact cause.  The inputs that I've received are that Phil was too aggressive and controlling when he first started as Consumer Technology Manager.  Conversations with people concerned suggest that Phil's approach has improved in the past month.  The consensus is that Phil is really bright, <u>but that his management inexperience is the basis for the problem</u>.

J.A. 216 (emphasis added).  Based on this evidence, a jury could reasonably conclude that Luh was more qualified than Block in terms of leadership and team orientation skills.

In sum, I conclude that Izod's bases for not selecting Luh for the manager position are unworthy of belief (or at least very suspicious) because Luh was better qualified than Block under Izod's stated criteria.  The record is replete with evidence from

which a jury could conclude, as did the EEOC, that Izod was lying when he testified that he selected Block to be Consumer Technology Manager because of Block's superiority in (1) customer interaction, (2) planning, (3) leadership, (4) presentation skills, (5) team orientation, (6) new idea concepts, and (7) field expertise. The evidence of pretext that Luh presented is sufficient to survive a motion for summary judgment.

## III

For the foregoing reasons, I respectfully submit that this Court should reverse the district court's grant of summary judgment with respect to the race and gender discrimination claims. Thus, I dissent.