**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1600**

GLENDA W. WESTMORELAND,

Plaintiff - Appellee,

v.

TWC ADMINISTRATION LLC, d/b/a Time Warner Cable,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Max O. Cogburn, Jr., District Judge. (5:16-cv-00024-MOC-DSC)

Argued: March 21, 2019                                    Decided: May 22, 2019

Before GREGORY, Chief Judge, and NIEMEYER and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Chief Judge Gregory joined. Judge Niemeyer wrote a dissenting opinion.

**ARGUED:** Catrina Celeste Creswell, KABAT CHAPMAN & OZMER LLP, Atlanta, Georgia, for Appellant. Todd J. Combs, COMBS LAW, PLLC, Mooresville, North Carolina, for Appellee. **ON BRIEF:** Joseph W. Ozmer II, KABAT CHAPMAN & OZMER LLP, Atlanta, Georgia, for Appellant.

DIANA GRIBBON MOTZ, Circuit Judge:

After TWC Administration, LLC, d/b/a Time Warner Cable ("TWC"), fired Glenda Westmoreland, she filed this action, alleging that the company would not have done so but for illegal age discrimination. Following a three-day trial, the jury found for Westmoreland, and the district court denied TWC's motion for judgment as a matter of law. TWC now brings this appeal, principally contending that Westmoreland failed to present sufficient evidence to justify the jury verdict. But, as we have often held, once a jury has evaluated witness credibility, weighed evidence, and reached a verdict, a litigant seeking to overturn that verdict faces a steep hurdle. Because TWC cannot overcome that hurdle, we affirm.

I.

Although several facts were disputed at trial, in reviewing a district court's denial of judgment as a matter of law ("JMOL"), we "must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Thus, we "review the record as a whole" but "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "We also must assume that the testimony in favor of plaintiffs was credible, unless totally incredible on its face, and ignore evidence to rebut it." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1419 (4th Cir. 1991). Applying these principles to the evidence presented to the jury — including the testimony of Westmoreland, four TWC supervisors, and two current or former TWC employees — the facts are as follows.

2

Summit Cable, a predecessor of TWC, hired Westmoreland in May of 1985. Westmoreland, an African American woman, worked for Summit and its successor corporations for more than 30 years until TWC fired her in August of 2015. At that time, Westmoreland was nearly 61 years of age. During her three decades of employment, Westmoreland performed well, committing just two minor infractions prior to July of 2015.

In late 2013 and early 2014, TWC shifted its focus from customer service to sales. As part of this transition, the company implemented new expectations for record-keeping and quantitative metrics. Management assigned Westmoreland to a role that required her to interact more with customers and document her supervisory actions in detail. Westmoreland also shifted from working under the direct supervision of Dianne Carroway to the supervision of a new person transferred from New York, Janis Busgith.

After this transition, Westmoreland struggled to timely conduct and document newly mandated one-on-one meetings with her subordinates. However, her overall performance remained satisfactory. For example, in Westmoreland's 2014 performance evaluation, TWC rated her as "successfully meets expectations" overall and in every specific category except "grow[ing] and develop[ing] your associates," where it rated her "partially meets expectations" and noted her continued improvement. TWC increased Westmoreland's salary in February of 2015 consistent with, and as a result of, this evaluation.

Westmoreland testified that on July 21, 2015, she conducted a one-on-one meeting with a substantially younger subordinate named Jennifer Sherrill. Six days later, on July

3

27, Westmoreland met again with Sherrill to complete a form memorializing the July 21 meeting. When Sherrill dated her signature on the form July 27, Westmoreland whited out this date and asked Sherrill to write July 21, reflecting the date of their meeting. After Sherrill changed the date, Westmoreland emailed Busgith the altered form.

Days later, Busgith held "skip-level meetings" in which she met with Westmoreland's subordinates, including Sherrill, outside of Westmoreland's presence. Busgith directed Westmoreland to take the day off, which Busgith had never done before. In their meeting, Sherrill told Busgith that Westmoreland had asked her to alter the date next to her signature. Busgith reported this to Lauren Newcomb, a human resources generalist at TWC, who then investigated the matter. Jon Knotts, the regional human resources director, took a supervisory role. Busgith retrieved the altered document, reviewed it with Newcomb and Knotts, and observed the white-out.

In early August, Newcomb and Busgith spoke with Westmoreland and asked her about the white-out issue. Westmoreland explained that although she did not complete the one-on-one *form* on July 21, she had completed the one-on-one *meeting* with Sherrill on July 21, and this was why she had asked Sherrill to change the date Sherrill had initially placed on the form. According to Westmoreland, Busgith told her "not to worry about it" and indicated that this discussion amounted to "just a slap on the wrist."

Westmoreland heard nothing further until August 14, when Dianne Carroway came to her office and met with her unexpectedly. Newcomb joined by phone. Westmoreland did not know the reason for the meeting. When Carroway stated that Westmoreland had directed Sherrill to change the date on a document, Westmoreland

4

agreed that she had. Carroway then told Westmoreland that TWC was firing her, citing company policy that "[f]alse statements . . . may result in termination of employment." Carroway signed the termination paperwork as Westmoreland's "Supervisor/Manager." She did not provide Westmoreland with a copy of the termination paperwork.

In addition to Carroway, three other TWC officials were involved in the termination. Busgith initiated the decision; Knotts approved it; and Newcomb drafted the documentation of it. All three testified that TWC did not fire Westmoreland because of any fault in her performance. Instead, the company's *sole* justification was that Westmoreland had instructed Sherrill to change a date on one form and sent that form to management, raising "a lot of trust and integrity issues."

Busgith, Newcomb, and Knotts also testified that company policy permitted TWC to impose lesser sanctions, but TWC nevertheless opted to fire Westmoreland because of the "trust and integrity issues" raised by the backdated form. All four officials — Busgith, Carroway, Newcomb, and Knotts — testified that they had no other issues with Westmoreland's "integrity" during her three decades of work for TWC and its predecessors.

After delivering the firing decision to Westmoreland, Carroway gathered Westmoreland's belongings and escorted her out of the building. While walking to Westmoreland's car, Carroway stated, "Oh, girl, you don't have nothing to worry about. You'll get another job. Just go home and take care of those grandbabies." TWC chose one of Westmoreland's subordinates, a 37-year-old, to replace her. The company did not take any disciplinary action against Sherrill, who was then 43 years of age.

5

In addition to Carroway's statement, Newcomb acknowledged that she knew Westmoreland was "older," and Knotts conceded that he "could assume . . . by looking at them" that Westmoreland's replacement was younger. Although Busgith initially denied knowing Westmoreland (then over 60) was older than her (37-year-old) replacement, Busgith, too, ultimately testified that this age difference was apparent.

Westmoreland timely filed suit against TWC. She alleged that the company discriminated against her on the basis of race and age in violation of federal and state laws, including the Age Discrimination in Employment Act ("ADEA"). 29 U.S.C. §§ 621–34.[1] At the first trial, the court granted TWC's oral motion for JMOL on the race discrimination claims; a jury hung on the age discrimination claims, and the district court declared a mistrial.

In a re-trial solely on the age discrimination claims, the district court denied JMOL and a jury awarded Westmoreland a total of $334,500 in damages. TWC then renewed its motion for JMOL, arguing that Westmoreland had presented insufficient evidence to recover, that a "summary charge" the court gave to the jury was inaccurate and prejudicial, and that the court's questioning of witnesses caused a miscarriage of justice. The district court denied the motion. TWC now appeals.

---

[1] The parties asserted at trial, and do not now dispute, that an identical age discrimination analysis applies under both the ADEA and North Carolina law.

6

II.

TWC's primary contention on appeal is that Westmoreland offered insufficient evidence of age discrimination to support the jury's verdict.

A.

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a). An employee who alleges that her employer violated this prohibition "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). In other words, an employee cannot prevail on an age discrimination claim by showing that age was *one* of multiple motives for an employer's decision; the employee must prove that the employer *would not have fired her* in the absence of age discrimination. *Id.* at 177.

The Supreme Court's decision in *Gross* expressly preserved the longstanding rule that an employee may make out an ADEA claim using either direct or circumstantial evidence. *Id.* at 177–78. When analyzing ADEA claims grounded in circumstantial evidence, we use the three-stage, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Smith v. Flax*, 618 F.2d 1062, 1066–67 (4th Cir. 1980).[2] This framework recognizes "that the question facing triers of

---

[2] TWC does not contend that *Gross* heightens the burden that an employee faces under *McDonnell Douglas*. Nor could it, as "the *McDonnell Douglas* framework has long demanded proof" that an illegal consideration "was a but-for cause of a challenged (Continued)

7

fact in discrimination cases is both sensitive and difficult, and that there will seldom be eyewitness testimony as to the employer's mental processes." *Reeves*, 530 U.S. at 141 (internal quotation marks and alterations omitted).

At the first stage of *McDonnell Douglas*, a plaintiff must establish four elements to make out a prima facie case of age discrimination. *Id.* at 142. Specifically, she must prove that (1) at the time of her firing, she was at least 40 years of age; (2) she was qualified for the job and performing in accordance with her employer's legitimate expectations; (3) her employer nonetheless discharged her; and (4) a substantially younger individual with comparable qualifications replaced her. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006). The burden at this stage "is not onerous," and meeting it "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981).

When an employee has established a prima facie case, the burden shifts to the employer to "rebut th[is] presumption of discrimination." *Id.* at 254. To do so, the employer must "produc[e] evidence that" it acted "for a legitimate, nondiscriminatory reason." *Id.* "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal quotation marks omitted).

---

adverse employment action." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Thus, we held in *Foster* that the imposition of a "but-for" causation requirement in Title VII retaliation claims "[did] not alter the legal standard" under *McDonnell Douglas*. *Id.* The same is necessarily true for ADEA claims after *Gross*.

At the final stage, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappear[s]." *Id.* at 142–43 (internal quotation marks omitted). The employee must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant[-employer] were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "The ultimate burden of persuading the trier of fact" remains with the employee "at all times." *Id.*

B.

Westmoreland proceeds under *McDonnell Douglas*, and there is no meaningful dispute that the parties satisfied the first two stages of this burden-shifting framework. Accordingly, we must determine whether Westmoreland presented sufficient evidence for the jury to conclude that TWC's proffered reason for her termination — her backdating of a one-on-one form — was pretextual, and that the company's true motivation was unlawful age discrimination.

Westmoreland's evidence of pretext can be summarized as follows: she was nearly 61 years of age when fired, TWC terminated her after 30 years of consistently satisfactory work, it replaced her with a 37-year-old, the supervisory TWC official who delivered the news and signed the termination paperwork made a condescending and age-related remark immediately after the firing, and all TWC decisionmakers were aware of Westmoreland's advanced age. Moreover, although TWC's sole justification for its action was Westmoreland's backdating of a form in violation of company policy, the offense was isolated, lesser sanctions were available, and company officials had advised her that the offense was not serious and she had nothing to worry about. Taken as a

9

whole, this evidence was sufficient for a reasonable jury to determine that TWC's justification was pretextual and that the company fired Westmoreland to make room for a younger worker.

TWC proffers two arguments to avoid this result. Neither is persuasive. First, the company attempts to relitigate the facts. To be sure, TWC presented evidence contrary to Westmoreland's narrative, including testimony that the disputed one-on-one meeting actually occurred on July 27 rather than July 21; that Busgith and Newcomb warned Westmoreland that her infraction was quite serious; and that Carroway took no part in the decision to fire Westmoreland and only delivered the news because Busgith was busy. But the jury heard all of this testimony, and it appears to have instead credited the evidence on which Westmoreland relied, which included her trial testimony and the admissions by TWC supervisors in their trial testimony. *See, e.g.*, *Herold v. Hajoca Corp.*, 864 F.2d 317, 320–21 (4th Cir. 1988) ("Determining witness credibility is the job of the jury."). Because TWC's evidence was not "uncontradicted and unimpeached," TWC has not shown that the jury was "required to believe" its evidence, and we "must disregard [it]" at this stage of review. *Reeves*, 530 U.S. at 151 (internal quotation marks omitted).

Second, TWC attempts to ratchet up the legal standard. Before the district court, TWC repeatedly argued that a "pretext-plus" standard governed *McDonnell Douglas*

cases.[3]  The pretext-plus doctrine stems from a line of cases in which some circuits, including this one, had held that an employee could never demonstrate pretext, as is her burden at the third and final *McDonnell Douglas* stage, solely by undermining an employer's proffered explanation.  *See Reeves*, 530 U.S. at 140–41.  Instead, these courts had required, as a matter of law, that an employee introduce *new* evidence, separate from her prima facie case, that *not only* undercut the employer's justification *but also* showed a specific and discriminatory motive.  *See id.* (collecting cases).  In contrast, other circuits had held that an employee's proof of a prima facie case of discrimination, combined with sufficient evidence for a factfinder to reject an employer's proffered non-discriminatory reason, could suffice to sustain a finding of liability for intentional discrimination.  *See id.* at 140 (collecting cases).

In 2000, the Supreme Court in *Reeves* resolved the circuit split and abrogated this court's pretext-plus standard.  The *Reeves* Court explained that although "the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff[,] . . . it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Id.* at 146–47.  This was so because "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Id.* at 147.  In such circumstances, "the

---

[3] On appeal, TWC wisely does not argue that pretext-plus controls, but its brief leans heavily on cases employing pretext-plus analysis.  *See, e.g.*, Opening Br. at 34 (citing *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 383 (4th Cir. 1995)); *id.* at 35–36 (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298, 300 (4th Cir. 1998)).

11

trier of fact can reasonably infer . . . that the employer is dissembling to cover up a discriminatory purpose." *Id.*

In *Reeves*, the Court reasoned that "such a showing by the plaintiff will [not] *always* be adequate to sustain a jury's finding of liability." *Id.* at 148. For example, the Court noted, an employer would be entitled to JMOL "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision," or if the employee "created only a weak issue of fact as to whether the employer's reason was untrue *and* there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* (emphasis added). Generally, whether JMOL is appropriate depends on the strength of an employee's prima facie case, the probative value of the proof undercutting the employer's explanation, and any other relevant evidence. *Id.* at 148–49.

Applying this fact-bound, case-specific standard, we can only conclude that Westmoreland provided sufficient proof of pretext by TWC to support the jury's verdict. First, as part of her prima facie case, Westmoreland showed that TWC fired her at the age of nearly 61 and replaced her with a 37-year-old. *See id.* at 143 (teaching that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case" at final *McDonnell Douglas* stage).

In addition, Westmoreland introduced evidence to undermine TWC's proffered reason for her termination. TWC officials testified that the company fired Westmoreland because she misrepresented a date on a form, but Westmoreland undermined this claim, testifying that company officials had initially assured her the infraction was not serious, that it merited only "a slap on the wrist," and that she should "not . . . worry about it."

12

Thus, if the jury credited Westmoreland's testimony, TWC's stark about-face could reasonably have given rise to a firm "suspicion of mendacity" regarding the company's rationale. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Moreover, TWC's witnesses uniformly conceded that Westmoreland had served the company and its predecessors ably for more than three decades, during which time her supervisors never discerned any issues regarding her integrity. They further agreed that company policy permitted TWC to impose other, less severe sanctions for Westmoreland's alteration of the one-on-one report. In light of this testimony, the jury could reasonably have questioned whether firing Westmoreland for one infraction that did not require termination "was such an extreme overreaction as to be pretextual." *Kempcke v. Monsanto Co.*, 132 F.3d 442, 447 (8th Cir. 1998).[4]

---

[4] TWC maintains that the length and quality of Westmoreland's service is irrelevant because courts do not serve as "super-personnel department[s] weighing the prudence of employment decisions," *DeJarnette*, 133 F.3d at 299 (internal quotation marks omitted), and may not "second guess the wisdom of business decisions," *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992). TWC misapplies this principle. Of course, it would be improper for a jury to rule for an employee because it believed her firing was not a "wise" or "prudent" employment decision. But nothing bars a jury from considering an employee's tenure and performance in evaluating whether her employer's justification for her termination is so flimsy as to be *untrue* or *implausible*, and thus asserted in an attempt to mask a discriminatory motive. *See, e.g.*, *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (finding jury question as to pretext, in part because employee was terminated for minor scheduling issues and typos); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (noting pretext may be established by showing that a justification "was insufficient to warrant the challenged conduct" (internal quotation marks omitted)); *Kempcke*, 132 F.3d at 447 (holding "a reasonable factfinder could conclude" that firing employee for merely "giving innocently acquired documents to his attorney" was "an extreme overreaction" and therefore pretextual); *cf. Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (finding plaintiff's strong qualifications relevant to question of pretext in (Continued)

At oral argument, TWC conceded that *Reeves* abrogated the pretext-plus standard, but it sought to distinguish the facts in *Reeves* from those at hand. The facts are indeed different — as the facts in different cases tend to be. In *Reeves*, the Supreme Court held that an employee could create a jury issue solely by establishing a prima facie case and then offering evidence as to the *falsity* of the employer's proffered reason. *See Reeves*, 530 U.S. at 144–45. Here, Westmoreland established a prima facie case and then offered evidence as to the *implausibility* of her employer's reason. But Westmoreland's evidence of implausibility was not her *only* evidence that TWC's justification was a pretext for age discrimination. In fact, she presented additional evidence that permitted a reasonable inference of discriminatory intent.

Notwithstanding TWC's evidence to the contrary, the jury could have found that Carroway, a supervisory official who had just broken the news to Westmoreland of the firing and signed the termination paperwork as "Supervisor/Manager," was a decisionmaker[5] who harbored age-based animus based on her "grandbabies" comment. Carroway's statement was not the sort of innocuous "reflection" with "no disparaging

---

mixed-motives race discrimination case). Here, Westmoreland's tenure and performance support a reasonable inference that TWC's explanation is "unworthy of credence," which in turn is "probative of intentional discrimination." *Reeves*, 530 U.S. at 147.

[5] Our colleague in dissent believes such a finding would be "flatly unsupported by the record." Not so; undisputed evidence showed that Carroway had directly supervised Westmoreland prior to Busgith, continued to work in a managerial role at TWC thereafter, regularly assisted Busgith with her supervisory duties over Westmoreland when Busgith was unavailable, personally informed Westmoreland that TWC was firing her, and was the sole "Supervisor/Manager" to sign the documents terminating Westmoreland. Thus, the jury could reasonably infer that Carroway was involved in TWC's decision to terminate a 30-year employee.

undertones" that we have deemed insufficient, as a matter of law, to suggest age bias. *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994). Instead, when "consider[ing] the context in which" Carroway made this comment, the jury easily could have determined that the comment had nothing to do with age-neutral concerns like "the need to retain [employees] with cutting-edge skills in critical areas," and so credited Westmoreland's testimony that the comment was hurtful, condescending, and probative of discrimination rather than an "isolated . . . truism." *Mereish v. Walker*, 359 F.3d 330, 337 (4th Cir. 2004). Tellingly, Carroway did not deny making this statement, but simply testified that she could not recall whether she had done so.

Furthermore, Westmoreland offered undisputed evidence that all of the other potential decisionmakers (Busgith, Knotts, and Newcomb) were aware of her general age. In fact, Busgith acknowledged that although the 24-year age gap between Westmoreland and her replacement was readily apparent, Busgith had initially claimed to be unaware of it. The jury could reasonably have treated her reluctance to acknowledge the obvious as evidence of age discrimination. *See Reeves*, 530 U.S. at 147 (noting "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt" (internal quotation marks omitted)); *cf. Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext . . . ."); *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 928 F.2d 118, 122–23 (4th Cir. 1991) (finding discrepancy in employer's

15

justifications between termination and trial, based on employee's account, to be sufficient evidence of pretext).

*DeJarnette*, a pregnancy discrimination case from the pretext-plus era on which TWC substantially relies, is not to the contrary. There, we reversed a jury verdict because a probationary employee, who had worked for only 90 days, had "failed to satisfy either prong" of the pretext-plus standard with evidence that although she was a good worker, she received harsh performance evaluations before being fired while pregnant. *DeJarnette*, 133 F.3d at 298. Leaving aside the fact that pretext-plus is no longer the standard, there are multiple material differences between *DeJarnette* and this case. The *DeJarnette* court reasoned that an *employee's* evaluation of her own short-term performance was minimally probative, *id.* at 299; here, multiple *TWC-affiliated* witnesses agreed Westmoreland's performance was satisfactory across her 30 years of employment. In *DeJarnette*, the supervisor rendered his first negative evaluation "before he was aware of [the employee's] pregnancy," *id.*; here, all potential decisionmakers admitted to being aware of Westmoreland's approximate (and protected) age when they fired her. Finally, the employee in *DeJarnette* offered no evidence of pregnancy discrimination, *id.* at 300; here, as we have explained, Westmoreland did offer evidence of age discrimination.

TWC also relies on *Holland v. Washington Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007), but that case offers the company even less support. In *Holland*, we affirmed a grant of summary judgment to an employer where Holland alleged race discrimination and unlawful retaliation. *Id.* at 210. The employer explained that it had fired Holland because he repeatedly threatened and expressed hatred of his female supervisor, including

16

telling a company vice president that the supervisor "was a crazy bitch" and that he was "gonna show her!" *Id.* at 212. Neither party contended, and the facts did not remotely suggest, that termination was such an "extreme overreaction" to such conduct as to render the employer's justification implausible. *Kempcke*, 132 F.3d at 447. Instead, Holland disputed the underlying allegations. We held summary judgment appropriate because "uncontested evidence" established that the decisionmaker "honestly believed that Holland deserved to be discharged for threatening [his supervisor], regardless of whether Holland did in fact issue the threats." *Holland*, 487 F.3d at 212, 217. *Holland* thus has little in common with this case. Here, even if TWC honestly believed Westmoreland violated its policy, the jury could reasonably infer (as it apparently did) that the company used this as a pretext for discrimination based on the nature of her violation, her 30-year history of satisfactory work, the severity of TWC's response, the company officials' contradictory statements regarding the seriousness of her violation, and her additional circumstantial evidence of age discrimination.

*Burns v. AAF-McQuay, Inc.*, 96 F.3d 728 (4th Cir. 1996), provides a far stronger parallel to the case at hand than *DeJarnette* or *Holland*. In *Burns*, we held that where an employee undercut nearly all of an employer's purported nondiscriminatory justifications for her termination and also offered evidence of a supervisor's "ambiguous comments about her age," there was sufficient evidence of pretext to survive JMOL. *Id.* at 733. Similarly, in *Tuttle v. Metropolitan Government of Nashville*, the Sixth Circuit concluded that evidence of a supervisor's "inconsistent testimony and statements," combined with

17

"age-related statements" from peer employees (but not supervisors), sufficed to establish an inference of pretext. 474 F.3d 307, 320 (6th Cir. 2007).

Like the employees alleging age discrimination in *Burns* and *Tuttle*, Westmoreland provided evidence to undermine TWC's proffered justification for terminating her, alongside evidence to suggest that its true reason was unlawful age discrimination. She thus offered sufficient evidence to satisfy her burden of proof under *Reeves*. Indeed, given the admissions by TWC supervisors that there was no other justification for Westmoreland's firing, this is far from a case where the record "conclusively reveal[s] some other, nondiscriminatory reason for [TWC's] decision," such that submission to the jury was inappropriate. *Reeves*, 530 U.S. at 148. Nor did TWC even purport to offer "abundant and uncontroverted independent evidence that no discrimination . . . occurred." *Id.* Accordingly, the trial court properly allowed the jury to weigh the competing evidence and reach a decision.

We cannot reverse a jury verdict simply because we might take a different view of the facts upon reading a cold record. Rather, the question before us is whether the jury had a basis from which *it* could reasonably conclude that TWC would not have terminated Westmoreland but for her age. We believe it did.

III.

TWC secondarily protests that the district court mismanaged the trial proceedings by erroneously instructing the jury and exhibiting prejudicial bias.

18

A.

TWC contests a "summary charge" the court gave at the end of its instructions. Absent legal error, we review a district court's jury charge under the highly deferential abuse of discretion standard. *See, e.g.*, *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) ("[W]e accord the district court much discretion to fashion [a] charge." (internal quotation marks omitted)).

The challenged summary instruction stated:

You've heard a lot of evidence concerning the backdating of a document. How this happened is not the real issue in this case. The issue for you to determine is whether the alleged backdating was a legitimate business reason for terminating plaintiff's employment.

And if you find it was a legitimate business reason, then you must move to the next step and decide whether the plaintiff has proven that such legitimate business reason was not the real reason but was a mere pretext for age discrimination. Even where an employer has a legitimate business reason to terminate an employee, the employer cannot use that legitimate business reason as a pretext, which means an excuse, a guise or a shield to terminate an employee because of her age. In determining whether such reason was a pretext for age discrimination, you must consider all of the evidence of record, including all of the circumstances that have been presented, any statements that were made, any evidence concerning plaintiff's years of service, and evidence concerning her job performance during such service. It is plaintiff's burden to prove that she would not have been terminated but for her age.

TWC contends that this charge modified its burden from one of production (i.e., needing to *articulate* a nondiscriminatory reason) to persuasion (i.e., needing to *prove* the validity of this reason). But even assuming this one instruction is susceptible to such a reading, the jury heard the instructions "in [their] totality." *Noel*, 641 F.3d at 586. And immediately prior to this charge, the court expressly instructed the jury that TWC "[did]

19

not have to persuade [the jury] of [its legitimate nondiscriminatory rationale] by a preponderance of the evidence," but needed only "to produce enough evidence . . . to create a genuine issue of fact." Thus, there is no "reasonable probability" that any error "affected the jury's verdict." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 305 (4th Cir. 2018) (internal quotation marks omitted).[6]

TWC also urges reversal because the court listed purportedly extraneous factors near the end of the charge (namely, Westmoreland's "years of service" and her "job performance") and used the phrase "legitimate business reason" instead of "legitimate nondiscriminatory reason." Because the company did not object before the trial court on either basis, we review for plain error, which TWC has not established. *See Hafner v. Brown*, 983 F.2d 570, 578 (4th Cir. 1992). As to the listed factors, we perceive no error because the jury was entitled to consider Westmoreland's tenure and performance. *See supra* n.4; *see also Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1294 (4th Cir. 1995) ("A set of legally accurate instructions that does not effectively direct a verdict for one side or the other is generally adequate."). And as to the use of "business reason," TWC *agreed* with the court that its "burden [was] to produce a legitimate business reason." Although this phrasing was technically incorrect, the court elsewhere admonished the jury not to second-guess TWC's business judgment. The jury could not have understood the passing

---

[6] To the extent that TWC additionally contends the court erred by submitting stage two of *McDonnell Douglas* to the jury *at all*, it agreed to other jury instructions that did precisely that, and it does not challenge these on appeal.

usage of "legitimate business reason" to override this. *See BMG Rights Mgmt.*, 881 F.3d at 305; *Noel*, 641 F.3d at 586.

Finally, we note that the district court had good reason to focus the proceedings. Outside the presence of the jury, the court repeatedly noted that counsel had emphasized minimally relevant factual disputes that risked confusing the issues, to the potential detriment of both parties. In fashioning the summary charge, the court explained, it sought to ensure that the jury would not be distracted by an immaterial "he said/she said" disagreement. We cannot fault it for doing so.

Therefore, none of TWC's challenges to the summary charge warrant reversal.

B.

Last, TWC contends that the district court's questioning of witnesses improperly influenced the verdict. In considering this claim, we do not "police the conduct of trials against some general model of judiciousness," but review only "for prejudicial trial court error in the specific case." *United States v. Head*, 697 F.2d 1200, 1210 (4th Cir. 1982). Moreover, because TWC never objected to the court's questioning, we may reverse only if the court's conduct was "so prejudicial as to deny [TWC] an opportunity for a fair and impartial trial." *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987) (internal quotation marks omitted).

The district court's conduct falls well short of this standard. The court asked witnesses between two and ten questions each. Had it not done so, the jury would have been left unaware of material facts. *See United States v. Parodi*, 703 F.2d 768, 775 (4th Cir. 1983) ("[A judge] should not hesitate to ask questions for the purpose of developing

21

the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other." (internal quotation marks omitted)). These limited questions do not begin to rise to the level of depriving TWC of a fair trial. *See, e.g.*, *United States v. Smith*, 452 F.3d 323, 331 (4th Cir. 2006) (finding no reversible error where trial court raised numerous objections and asked several questions, and recognizing court's "duty to rein in . . . questioning when it strays too far from matters in dispute"); *Stillman*, 811 F.2d at 839 (stating that "Well any five year old idiot knows that. Don't waste my time and the jury's time on that" would not be enough for reversal).[7]

IV.

For the foregoing reasons, our review of the record as a whole satisfies us that the jury grounded its verdict in sufficient evidence and that the district court managed the proceedings fairly. The judgment of the district court is accordingly

*AFFIRMED*.

---

[7] In arguing to the contrary, the dissent "isolate[s] the district [court's] questions from their place in [each] witness's entire testimony" and gives short shrift to the court's "obligation to clarify confused factual issues or misunderstandings." *Smith*, 452 F.3d at 333 (internal quotation marks omitted). Moreover, the dissent heavily relies on statements that the court made outside the presence of the jury. Such statements could not "unfairly prejudice[] *the jury* against [TWC's] case," as would be required for us to reverse. *Stillman*, 811 F.2d at 838–39 (emphasis added).

22

NIEMEYER, Circuit Judge, dissenting:

There is absolutely no evidence that Glenda Westmoreland was fired because of her age. The subject of age never came up during discussions relating to the termination of her employment. Rather, she was fired, according to her employer, because she altered critical work-related documents to her benefit. To prove the necessary animus for age discrimination, Westmoreland relies on a stray comment made to her by Dianne Carroway, who was the employee who announced to Westmoreland that she had been fired but who was not a decisionmaker and did not have any input into the decision to fire Westmoreland. The majority's statement that Carroway could be found to be a decisionmaker, *ante* at 14, is flatly unsupported by the record.

In any event, the comment on which Westmoreland relies — "Oh, girl, you don't have nothing to worry about. You'll get another job. Just go home and take care of those grandbabies" — is a stray and ambiguous one that surely cannot demonstrate the necessary animus for age discrimination. *See Mereish v. Walker*, 359 F.3d 330, 336–37 (4th Cir. 2004) (holding that "general or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination"). It is thus well established that comments that refer to making way for younger people do not create any inference of age bias. *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511–12 (4th Cir. 1994) (holding that the statement that "there comes a time when we have to make way for younger people" is insufficient to create any "inference of age bias" because it is a stray remark which merely reflects a fact of life); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942–43 (4th Cir. 1992) (holding that references to the need to "attract newer,

23

younger people" or "young blood" were insufficient evidence of age bias because they were isolated and merely reflected a truism of business life).

Absent Carroway's comment, Westmoreland only proved that she was 60 years old and was replaced by someone 37 years old. If that is all that is required, virtually every person over 40 will have an age discrimination claim when fired for a reason that the jury considers unfair.

And in this case, the district court did indeed make unfairness the issue for the jury to decide. During the entire course of trial, the court expressed its own view to the jury that termination of a 30-year employee for a single incident of falsifying documents was unfair. It accomplished this by directing questions to *every witness* testifying in support of the employer, noting that numerous sanctions were available for Westmoreland's conduct but that her employer gave her "the ultimate smash" of termination, which the court viewed as "overreach." For example, the court asked one witness: "And it is the decision of the company that this one event resulted in the termination of a 60-year-old 30-year employee; is that right? That's what you're saying." And it questioned another yet more pointedly: "Did you know there were a number of sanctions that could be done for this particular offense if you all chose to do it? That is suspension, demotion, and other certain things. Were there other things that could have been done?" And then, during its discussion with counsel regarding the instructions that it planned to give the jury — and did give to the jury — the court summarized its view of the case, stating:

> [The jury] can look — they can look and use their common sense and say, wow, 30 years. One swing and a miss and, oh, my Lord, we've got to get rid of this lady. We're going to make it so she'll never get another job.

24

> We're not going to let her retire. We're not going to demote her. We're not going to lay her off for a few days and punish her. We're not going to make it clear that we're not going to do this. We are going to fire her and make sure she's unemployable from now on. And that's really what happened.

Finally, when instructing the jury, the court actually stated that unfairness was the issue for the jury to decide. As the court told the jury: "*The issue for you to determine* is whether the alleged backdating was a legitimate business reason for terminating plaintiff's employment." (Emphasis added).

In short, while the evidence of age discrimination in the decision to fire Westmoreland was undoubtedly insufficient, the jury was asked to decide whether the decision to fire Westmoreland was fair.

Congress would croak to learn that the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*., would entitle an employee to recover in the circumstances of this case. I too croak, in harmony.